[Nos. S022153, S093694. July 26, 2007.]

In re JAMES EDWARD HARDY on Habeas Corpus.

---

## COUNSEL

Fern M. Laethem, Lynne S. Coffin and Michael J. Hersek, State Public Defenders, Philip M. Brooks, Robin Kallman and Peter Silten, Deputy State Public Defenders, for Petitioner James Edward Hardy.

Daniel E. Lungren, Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, George Williamson, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack and Pamela C. Hamanaka, Assistant Attorneys General, Keith H. Borjon, Susan Lee Frierson, William T. Harter, Robert S. Henry, Robert F. Katz, Sharlene A. Honnaka and Roy C. Preminger, Deputy Attorneys General, for Respondent State of California.

---

## OPINION

## WERDEGAR, J.—

### I. INTRODUCTION

Petitioner James Edward Hardy was convicted in 1983, along with codefendant Mark Anthony Reilly, of the first degree murders of Nancy Morgan and her young son, Mitchell Morgan, and of conspiracy to commit murder to collect life insurance proceeds. (Pen. Code, §§ 187, 182.)[1] The jury also sustained six special circumstance allegations against both Hardy and Reilly, finding as to each murder that it was committed for financial gain, that the defendants committed a multiple murder and that they killed while lying in wait. (§ 190.2, subd. (a)(1), (3), (15).) The jury set the penalty for both defendants at death. On appeal, this court affirmed, striking one superfluous multiple-murder special circumstance. (*People v. Hardy* (1992) 2 Cal.4th 86 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

Our prior opinion in this matter was not the end of the legal road for petitioner Hardy. After the United States Supreme Court denied his petition for a writ of certiorari (*Hardy v. California* (1992) 506 U.S. 987 [121 L.Ed.2d 435, 113 S.Ct. 498]), he filed his first petition for a writ of habeas corpus with this court (*In re Hardy*, S022153 (*Hardy I*)). Because the petition alleged

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

facts sufficient to demonstrate a prima facie case for relief from the penalty judgment (*People v. Duvall* (1995) 9 Cal.4th 464 [37 Cal.Rptr.2d 259, 886 P.2d 1252]), we issued an order directing respondent to show cause "why petitioner is not entitled to reversal of *the penalty judgment* because his trial attorney rendered constitutionally ineffective assistance of counsel by failing to call, at the penalty phase of the trial, available witnesses who would have presented evidence of mitigating circumstances." (Italics added.) After receiving briefing, we directed a referee to hold a hearing and take evidence on two disputed questions of fact. After receiving additional briefing, we amended the order of reference to add an additional question for the referee's consideration.

Some delay ensued, but the referee eventually held a hearing at which several witnesses testified. The referee filed his report with this court in 1999. Petitioner then filed a second petition for a writ of habeas corpus based on facts adduced at the evidentiary hearing. (*In re Hardy*, S093694 (*Hardy II*).) This new petition alleged facts sufficient to demonstrate a prima facie case for relief from the guilt judgment. Accordingly, we issued a second order to show cause on two interrelated issues. Our order stated: "The petition for writ of habeas corpus, filed December 13, 2000, has been read and considered. The Director of Corrections is ordered to show cause before this court at its courtroom, when the proceeding is ordered on calendar, why petitioner is not entitled to reversal of his *guilt judgment* because [1] he is innocent of the capital crimes of which he was convicted, [in that] a third party named Calvin Boyd committed the murders, and [2 that] petitioner's trial counsel rendered constitutionally ineffective assistance of counsel by failing to present evidence demonstrating petitioner's innocence." (Italics added.)

We consolidated *Hardy I* and *Hardy II* on April 18, 2007, and now reach the following conclusions: (1) Because petitioner's allegations in *Hardy II* are based on facts found by the referee as a result of the evidentiary hearing in *Hardy I*, a second hearing is unnecessary; (2) petitioner's allegations, to the extent they were sustained by the referee, fail to demonstrate petitioner is actually innocent of the crimes for which he was convicted because they do not undermine the prosecution's *entire case or point unerringly to innocence*; (3) petitioner's allegations that a third party named Calvin Boyd committed the murders, largely sustained by the referee, demonstrate his trial counsel's representation was deficient because he failed, without a supportable tactical reason, to investigate reasonably available evidence of third party culpability; (4) such deficient representation nevertheless does not require reversal of the guilt judgment because counsel's failure to investigate did not undermine the prosecution's theory that petitioner *conspired* to commit the murders, and such conspiracy rendered petitioner liable for first degree murder irrespective of the possibility that a third party actually killed the victims; (5) the allegations of third party culpability, as sustained by the referee, require we

vacate the penalty judgment because, had the jury entertained a reasonable doubt that petitioner was the actual killer and concluded he was merely a coconspirator, there is a reasonable probability it would have returned a sentence of life instead of death; and (6) in light of the latter conclusion, we discharge the order to show cause in *Hardy I* and dismiss that petition as moot.

## II. Background[2]

Clifford and Nancy Morgan lived in Van Nuys and had a son, Mitchell, who was eight years old at the time of the murders. Clifford Morgan (Morgan) devised a plan to kill his wife and son in order to collect on some unusually large life insurance policies he had purchased. He enlisted the assistance of Reilly, a much younger coworker over whom he had acquired some influence. At this time, Reilly and petitioner, as well as many of the witnesses and coconspirators in this case, lived in the same apartment complex on Vose Street in Van Nuys. The depth and breadth of the ensuing conspiracy to kill the victims need not be recounted here in full; suffice it to say, Reilly agreed to Morgan's plan and sought a partner for the planned murders. Reilly's attempt to hire a kickboxer named Marc Costello to kill the victims came to naught. Reilly then turned to fellow Vose Street resident Calvin Boyd[3] and his friend Marcus.[4] Many of the residents of the Vose Street apartment complex were acquainted with Boyd, a key player in petitioner's present collateral challenge to his convictions, who, unknown to them, was at the time a fugitive from justice. After much preliminary involvement in the conspiracy, Boyd (according to his trial testimony) declined to participate in the murders of Nancy and Mitchell Morgan due to Reilly's inability to pay him any money or cocaine in advance.

Reilly then turned to petitioner as a third option, believing he could convince him to commit the murders. A few weeks before the murders, Reilly told his friend Joe Dempsey that petitioner might agree to assist in the murders. Sometime later, Reilly told his friend Michael Mitchell that petitioner had agreed to help him.

Debbie Sportsman provided critical evidence against Reilly and about the conspiracy in general. She met Reilly in April 1981 and began an intimate

---

[2] Facts of the case, especially those related to codefendants Reilly and Clifford Morgan, are recounted in greater detail in *People v. Hardy, supra,* 2 Cal.4th at pages 118–126.

[3] Boyd was also known as Washington Kelvin Boyd, Calvin McKay and Kelvin Boyd. We will refer to him by his apparently true name, Calvin Boyd.

[4] Marcus, whose last name is unknown and who was not produced at the evidentiary hearing, was apparently a confidante or close acquaintance of Boyd's around the time of the murders.

relationship with him. While having dinner with Sportsman and her parents, Reilly mentioned that Morgan wanted to have his wife killed in order to collect on some insurance policies. Sportsman's mother thought this was "just talk." As Sportsman later found out, however, Reilly was quite serious. He told her he had agreed to help Morgan find someone to kill his wife. In return, Morgan had agreed to allow Reilly to live in Morgan's home and to manage a bar that Morgan intended to open.

In May 1981, Morgan moved to Carson City, Nevada, ostensibly for business reasons, but more probably to establish an alibi. Sometime in the night of May 20 to 21, 1981, two persons alleged to be petitioner and Reilly went to Morgan's Van Nuys home, entered with a key provided by Morgan, cut the chain lock with boltcutters and went to the back bedroom where Nancy slept. Because her husband was away from home, their son, Mitchell, was sleeping in his mother's bedroom. The assailants stabbed Nancy and Mitchell Morgan to death. Evidence showed Nancy was stabbed 45 times and her son 21 times, including multiple wounds on his neck. Police found a pillow soaked in blood with several puncture marks, indicating the assailants had stabbed the victims through the pillow. Experts testified that physical evidence suggested at least two persons were responsible for the slayings. The estimated time of death was between 3:30 and 5:30 a.m.

The conspiracy began to unravel almost immediately. After the murders, Reilly admitted his guilt to Sportsman and made numerous other incriminating admissions to her, including that victim Nancy Morgan had said "Please don't kill me," that more than one perpetrator was involved, that boltcutters had been used to cut the chain lock on the door (a fact not made public by the police) and that a fish knife had been used in the killings.

Boyd testified that shortly after the murders, when he and Reilly were together in the apartment's laundry room, Reilly admitted that he and petitioner Hardy were the killers. Boyd also testified that Reilly showed him some boltcutters he had recently purchased.

Michael Mitchell, Reilly's roommate, testified that he came home from a baseball game the night of the murders and went to sleep sometime after 11:00 p.m. At that time, no one else was in the apartment. He got up around midnight and saw petitioner, Reilly, Colette Mitchell (apparently no relation), and possibly a neighbor, Steven Rice, in the apartment. Later that night, he heard male voices in the apartment and some people taking showers. The next morning, he found wet towels in the bathroom, suggesting someone had taken a shower, but he saw no evidence of blood.

Boyd testified that the morning after the murders, sometime after 8:00 a.m., he walked through Steven Rice's apartment as a shortcut to the street,

something he often did. There, he saw Reilly and petitioner sleeping, thereby placing the two men together shortly after the crimes. Boyd also testified he saw Rice and Colette Mitchell in the apartment.

Morgan's purchase of an unusually large amount of life insurance shortly before the murders was suspicious, as were his statements to a neighbor shortly before the murders that his wife was worth more dead than alive and he expected she would die before him. A web of circumstantial evidence, not relevant to the instant collateral attack, linked Reilly to Morgan. In addition, Reilly could not explain how a stain of human blood came to be on his shoe. No physical evidence, such as blood, hair, fingerprints or footprints linked petitioner to the murders.

Colette Mitchell, petitioner's girlfriend at the time, gave testimony that was important in connecting him to the crimes. She had initially given petitioner an alibi, testifying at the preliminary hearing that she was with him the entire night of the murders. By the time of trial she had changed her story and admitted she had perjured herself at the preliminary hearing. Although she often claimed she could not remember many of the details of the events in question and admitted she intentionally tried to forget things about the case, she no longer was sure petitioner was with her the entire night of the murders. She testified at trial under a grant of immunity, but admitted that even after receiving immunity and consulting an attorney, she contacted petitioner in jail intending to assist him.

Nevertheless, Colette testified to the following: On the night of the murders, she was working at a restaurant. Reilly, petitioner and Steven Rice met at the restaurant shortly after 9:00 p.m., and Colette served them drinks. The four then returned to the Vose Street apartments around 10:00 p.m. to "party" and use cocaine. They also used a beer bong.[5] Colette admitted to doing several large lines of cocaine and drinking at least three beers using the beer bong. She quarreled with petitioner, left Reilly's apartment and went to Rice's apartment next door.[6] Sometime between midnight and 2:00 a.m., she and Rice went out and purchased more beer. After she returned, petitioner sought her out at Rice's apartment and told her not to leave him because he "needed her" that night. Although she had consumed an unusually large amount of cocaine, which usually had the effect of keeping her awake, she testified she fell asleep or passed out in Rice's apartment sometime thereafter and did not awaken until around 11:00 a.m. the next morning. Hardy was asleep next to her, and Reilly was asleep on the sofa.

---

[5] A beer bong is "a funnel-type device which enables the user to pour beer directly down his throat and into his stomach." (*People v. Hardy, supra,* 2 Cal.4th at p. 182.)

[6] Reilly lived in an apartment with Michael Mitchell. Steven Rice rented the apartment next to them, and at the time petitioner lived with Rice.

Colette testified she misled police by telling them she was with petitioner the entire night. Although immediately after the crimes she was sure she had been with both Reilly and petitioner the entire night, she had changed her mind by the time of trial. At trial, she claimed she was either asleep or passed out for much of the night and thus did not know if petitioner left the apartment or not. Reilly told her once that he and petitioner had left the apartment while she was asleep, but another time told her they had not left. When speaking with petitioner after the murders, they discussed his alibi "all the time."

Some of Colette's testimony implicated petitioner directly in the murders. For example, prior to the murders, petitioner led her to believe he was going to steal something from someone to enable an unnamed person to collect on an insurance policy. Petitioner told her at least twice that he had been to the victims' home the night of the murders. First, he told her "that he went to the house and that the people were still alive because he heard them snoring." Later he told her "that he went to the house and that they [had] already been dead, killed." Another time, he told her, "I'll say one thing; we were at the house." These statements were contradicted by other of petitioner's statements to her, such as that "he didn't do it." In addition, although Reilly admitted to Colette that he knew the identity of the killers, petitioner disclaimed such knowledge. When she asked Reilly directly whether petitioner was the killer, Reilly told her, "No." When she asked petitioner himself, he also answered in the negative. On cross-examination, Colette admitted petitioner had never told her he actually killed either victim.

Colette recounted other statements petitioner had made that, although not directly implicating him in the murders, suggested he was at least a coconspirator. For example, he told her the crime was to be accomplished by cutting a chain, entering the back door and then making it appear as if a robbery had occurred. Petitioner was to receive a portion of $40,000 or $50,000, but in fact received only $1,000. She remembered the $1,000 because she put the stack of bills in a particular cedar box. Petitioner told her that Morgan was not worried about the delay the trial caused because his insurance proceeds were earning 12.75 percent interest; the less she knew about the crimes, the better off she would be; Reilly was in charge of the situation; people who said the murder was committed by more than one person were wrong because petitioner " '[knew] for a fact it was one' "; petitioner took something from Morgan's home to make it look like a robbery; and the killers used boltcutters. Colette also testified Reilly had told her that Boyd and his friend Marcus were supposed to commit the crimes but backed out because Reilly declined to go with them.

Petitioner's connection to a rifle and some shoes also provided evidence of his participation in the conspiracy. Morgan had reported several

items missing in the attack, including an M1 carbine World War II-era rifle. Colette testified that petitioner, although in pretrial detention, asked her to ask his brother, John Hardy, to retrieve and dispose of an M1 carbine rifle in Reilly's apartment. She complied, and John Hardy thereafter retrieved the rifle and took it to his girlfriend's house. He later turned it in to police. In addition, Colette testified petitioner told her police had discovered a footprint at the crime scene and asked her to retrieve and destroy some of his shoes. She did so, throwing the shoes in the garbage.

Petitioner, Reilly and Morgan were tried together in Los Angeles County Superior Court. Petitioner was represented by Los Angeles County Deputy Public Defender Michael Demby. At trial, Morgan denied conspiring with Reilly to commit the murders, but testified that while in pretrial detention, Reilly admitted he had attempted to find someone who would kill Morgan's wife, but had failed in the attempt and then let the matter drop. On Demby's advice, petitioner did not testify. In fact, Demby presented no evidence at the guilt phase of the trial, but rested on the state of the People's evidence. Reilly also declined to testify.

Petitioner and Reilly were convicted of two counts of first degree murder (§ 187), one count of conspiracy to commit murder to collect life insurance proceeds (§ 182) and several special circumstance allegations (§ 190.2, subd. (a)(1), (3), (15)). Morgan was also convicted of capital murder charges, but after the guilt phase, the trial court severed his case from petitioner and Reilly's penalty trial due to his failing health. Morgan, the apparent mastermind of the deadly conspiracy, died of bone cancer before the penalty phase of his separate trial could be held.

At petitioner's penalty phase, the prosecution introduced into evidence three photographs of the crime scene, including the victims, that had been excluded from the guilt phase. In addition, the prosecution presented evidence of a 1980 domestic disturbance in which police had found petitioner marching with a rifle, military style, apparently unaware of his surroundings. At the request of the police, petitioner put the rifle as well as two knives on the ground, but then brandished a nunchaku and assumed a martial arts fighting stance. He stayed in that stance for five or 10 minutes, but eventually agreed to lay down his nunchaku if one of the officers would holster his revolver. The matter ended peacefully, and petitioner explained he had been in a quarrel with his family. The rifle was not loaded. Petitioner later pleaded guilty to two misdemeanors and was placed on probation. (*People v. Hardy*, *supra*, 2 Cal.4th at pp. 126–127.)

Petitioner's mother, Carolyn Hardy, testified at the penalty phase and recalled that petitioner had had a fight with his brother John, punching him

and tearing a gold chain off his neck. When Carolyn called the police, petitioner kicked down her door. She also testified that the nunchaku belonged to Robert, petitioner's other brother. Robert had threatened to commit suicide, but petitioner did not believe him. When Robert in fact committed suicide, petitioner blamed himself and jumped off a cliff, breaking both his legs. (*People v. Hardy, supra*, 2 Cal.4th at p. 127.) Petitioner's mother believed he needed psychiatric help.

In mitigation, Carolyn Hardy recalled that when petitioner was a teenager, he "participated in a program called Outward Bound, which involved camping and hiking in Colorado. He was chosen for the program because of his high scholastic potential." (*People v. Hardy, supra*, 2 Cal.4th at p. 127.) Defense counsel presented no other mitigating evidence. During closing argument, counsel argued the jury should return a verdict of life due to a lingering doubt about petitioner's guilt.

## III. Hardy I

Petitioner filed his petition for a writ of habeas corpus in *Hardy I* with this court on July 26, 1991, and filed a set of supplemental allegations on February 24, 1992. In those filings, petitioner alleged his trial attorney was constitutionally ineffective in three ways: (1) for failing to call available witnesses at the penalty phase who would have provided mitigating evidence; (2) for failing to investigate to determine whether such witnesses existed; and (3) for making an unreasonable tactical decision to rely solely on a lingering doubt defense at the penalty phase. For example, petitioner alleged in *Hardy I* that several family members and friends, if called, would have testified to his positive attributes and difficult upbringing. Petitioner alleged that his father was schizophrenic and had physically abused him as a child, one time holding him out of a 12th floor window and threatening to drop him. After his father's hospitalization, petitioner alleged he assumed the role of father figure to his siblings and the family lived in a poor area of Newark, New Jersey. Declarations accompanying the petition in *Hardy I* alleged that petitioner was a caring and considerate child who did well in school and that he did not finish high school, leaving school at age 16 to marry Patricia May, the mother of his child. The declarants asserted petitioner had a second child before divorcing, and that later in life, petitioner was a devoted and loving father. These declarants stated it was inconceivable petitioner could have murdered a child.

In addition to the suicide of petitioner's brother, the petition in *Hardy I* revealed two other major incidents that greatly affected him. First, Tina, his live-in lover whom he planned to marry, was killed in a car accident. Declarations filed in support of the petition in *Hardy I* state that after Tina

died, petitioner "didn't want to do anything with his life [and] had no ambition for a long time." A second incident involved petitioner's involuntary commitment to a state mental hospital after a drug-induced psychotic episode. The tentative diagnosis of mental health professionals was chronic undifferentiated schizophrenia.

Petitioner's children, who were ages 11 and eight at the time of trial, declared that they would have testified they loved petitioner, that he was a "very good and caring father," and that they would have asked the jury to spare their father's life. Petitioner alleged Demby provided no reason why he did not call the children to testify at the penalty phase. In his supplemental allegations, petitioner alleged his trial attorney should have presented evidence that petitioner, then working as a municipal bus driver, had acted heroically when he intervened to stop the robbery of an elderly woman on his bus. Petitioner allegedly sustained serious injuries as a result.

After receiving appropriate briefing, this court issued an order directing the Director of Corrections to show cause "why petitioner is not entitled to reversal of the penalty judgment because his trial attorney rendered constitutionally ineffective assistance of counsel by failing to call, at the *penalty phase* of the trial, available witnesses who would have presented evidence of mitigating circumstances." (Italics added.)

We then referred the matter to a referee to resolve disputed allegations of fact. Our order of reference, as later amended for reasons unnecessary to relate here, provided: "(1) Did petitioner Hardy engage in an act of heroism while employed as a driver for the Southern California Rapid Transit District? [¶] (2) Was defense counsel Michael Demby made aware of the facts surrounding the incident? [¶] (3) What were Mr. Demby's reasons why he did not present evidence of this incident, or the uncontradicted evidence of other available witnesses who would have provided mitigating evidence at the penalty phase of the trial? [¶] (4) Were Mr. Demby's reasons supportable?"

After an evidentiary hearing, the referee filed his report on September 21, 1999. Petitioner then filed his petition for a writ of habeas corpus in *Hardy II*, alleging—based on facts adduced at the hearing for *Hardy I*—that he was entitled to relief not just from his penalty judgment but from his guilt judgment as well. Based on some of the allegations in the *Hardy II* petition, we issued an order to show cause on February 14, 2001, and have held *Hardy I* in abeyance. As we explain *post*, because we conclude petitioner is entitled to relief from his penalty judgment based on the allegations in his *Hardy II* petition, we address that petition here and dismiss the *Hardy I* petition as moot.

## IV. HARDY II

### A. *Preliminary Issues*

#### 1. *A Second Evidentiary Hearing Is Unnecessary*

Although petitioner presented numerous allegations in *Hardy II* attacking both his guilt and penalty judgments, we issued an order to show cause as to only two interrelated claims: Is petitioner "entitled to reversal of his guilt judgment because [1] he is innocent of the capital crimes of which he was convicted, [in that] a third party named Calvin Boyd committed the murders, and [2] because petitioner's trial counsel rendered constitutionally ineffective assistance of counsel by failing to present evidence demonstrating petitioner's innocence[?]" Issuance of the order indicates we concluded petitioner's allegations on these issues state a prima facie case for relief. We have also concluded that the allegations were made without substantial delay; the petition asserts that its allegations are timely, and respondent does not allege otherwise.

■ Respondent denies the facts alleged in the *Hardy II* petition, and petitioner reasserts his factual allegations in his traverse; hence, we normally would order an evidentiary hearing before a referee to determine the truth of the disputed allegations of facts: "[I]f the return and traverse reveal that petitioner's entitlement to relief hinges on the resolution of factual disputes, then the court should order an evidentiary hearing. (Pen. Code, § 1484.) Because appellate courts are ill-suited to conduct evidentiary hearings, it is customary for appellate courts to appoint a referee to take evidence and make recommendations as to the resolution of disputed factual issues." (*People v. Romero* (1994) 8 Cal.4th 728, 739–740 [35 Cal.Rptr.2d 270, 883 P.2d 388].) Following receipt of the referee's report, we would entertain the parties' exceptions to its accuracy. (See *In re Malone* (1996) 12 Cal.4th 935, 941 [50 Cal.Rptr.2d 281, 911 P.2d 468]; *In re Avena* (1996) 12 Cal.4th 694, 709–710 [49 Cal.Rptr.2d 413, 909 P.2d 1017]; *In re Branch* (1969) 70 Cal.2d 200, 203 [74 Cal.Rptr. 238, 449 P.2d 174].)

Under unusual circumstances, however, this court may decline to order a hearing and simply decide the case. For example, "[i]f the written return admits allegations in the petition that, if true, justify the relief sought, the court may grant relief without an evidentiary hearing. [Citations.] Conversely, consideration of the written return and matters of record may persuade the court that the contentions advanced in the petition lack merit, in which event the court may deny the petition without an evidentiary hearing." (*People v. Romero, supra,* 8 Cal.4th at p. 739.) Apparently invoking this latter option, respondent asserts the instant petition "may be denied without an evidentiary hearing."

We agree an evidentiary hearing is not required to resolve the issues raised in the present petition, but for a different reason. The circumstances of this case are unusual, in that our referee has already held one evidentiary hearing (albeit in response to allegations in the petition for *Hardy I*) and petitioner's present factual allegations *are based on both evidence presented at that hearing that has already been evaluated by the referee, and on witnesses who testified at the hearing whom the referee has already found credible.* Stated differently, petitioner has already presented evidence in a contested hearing, and the referee has already determined the truth of facts alleged, including the credibility of various witnesses. Moreover, as we explain *post*, we largely reject respondent's exceptions to the accuracy of the referee's conclusions.

Respondent's denials in *Hardy II* of the same facts alleged and found true in *Hardy I* cannot undermine the referee's considered factual conclusions at this late date. Holding a second evidentiary hearing on those facts would also be futile. Respondent had an adequate opportunity to examine the witnesses who testified at the hearing in *Hardy I*. Indeed, one witness was ordered returned from Kentucky to permit respondent to cross-examine him. Although respondent contends it did not cross-examine petitioner's witnesses (e.g., Raynall Burney, James Moss, Rickey Ginsburg and Michael Small) "with an interest and motive similar to that which respondent has in the present habeas corpus proceeding," it does not persuasively explain in what different fashion it would have conducted its cross-examination. Although respondent objected to the examination of these witnesses on the ground that questions of factual innocence were beyond the scope of the reference order, the referee overruled the objection. (See discussion, *post*.) Accordingly, respondent had every incentive to aggressively question these witnesses at the evidentiary hearing in *Hardy I*.

Nor is it likely respondent could show how it would have conducted its cross-examination differently. The third question in our amended order of reference for *Hardy I* stated: "(3) What were Mr. Demby's reasons why he did not present . . . the uncontradicted evidence of other available witnesses who would have provided mitigating evidence at the penalty phase of the trial?" Evidence of Boyd's culpability would have constituted strong mitigating evidence for the penalty phase, supporting defense counsel's strategic choice to rely on a lingering doubt defense; thus, respondent had ample incentive to demonstrate why counsel would have been justified in not presenting this evidence. Moreover, the record reveals no lack of effort on respondent's part to discredit petitioner's witnesses on cross-examination. Accordingly, to the extent petitioner's present claims for relief are based on facts already litigated and determined by the referee, respondent's continued

disputation of those facts is fruitless, and no reason appears to justify the holding of an additional, superfluous evidentiary hearing.[7]

### 2. *Was Evidence of Third Party Culpability Outside the Scope of Our Reference Order?*

In response to the referee's report in *Hardy I*, respondent—before this court issued its order to show cause in *Hardy II*—filed its exceptions to the report. Respondent raises among those exceptions an important threshold question: Was evidence of Boyd's possible guilt of the murders outside the scope of our order of reference in *Hardy I*? Recalling that our order to show cause in *Hardy I* concerned the penalty phase only, respondent, as it did before the referee, argues that "nothing in the habeas corpus petition [in *Hardy I*] or the supplemental pleadings thereto filed by petitioner set forth a claim of factual innocence [and] this Court obviously did not have a factual innocence claim before it for consideration when it filed the amended reference order in July of 1994." As we explain, we conclude the referee did not err in ruling the issue was within the scope of our reference order.

At the outset of the evidentiary hearing in *Hardy I*, respondent objected to third party culpability evidence it anticipated petitioner would present, arguing that such evidence was not within the terms of our amended reference order. The referee declined to rule on the motion, wishing to see the direction the evidence would take, but later raised the issue sua sponte, essentially having respondent renew its objection. After hearing from both sides, the referee ruled he would not strike the evidence, explaining: "I am going to deny [respondent's] motion to strike [the evidence] because I think it [is] relevant to the lingering doubt issue." The referee stated, however, that the evidence of third party culpability was beginning to appear cumulative and he reserved the right to control the evidence on that ground.

Petitioner in *Hardy I* alleged his trial attorney was ineffective at the penalty phase for failing to present available mitigating evidence. He claimed Demby should have presented evidence that he engaged in an act of heroism, coming to the aid of a bus passenger being robbed, at great peril to himself, and evidence of his Outward Bound experience as a teenager. After referencing those issues, this court's order asked the referee to determine Demby's reasons for not presenting this available mitigating evidence and whether his reasons were "supportable."

In order for the referee to decide whether Demby's reasons were supportable, the referee was required to assess the overall strength of the mitigating

---

[7] As we explain at various points *post*, we accord no weight to those factual allegations for which the referee did not make any factual findings. (See, e.g., pt. IV.B.8., *post*.)

evidence available to counsel. If strong mitigating evidence was available (e.g., family history, mental illness), counsel's decision to forgo it was more likely unreasonable. Similarly, if the available evidence supporting lingering doubt was weak, Demby's tactical decision to rely solely on that defense at the penalty phase would be questionable. On the other hand, if persuasive evidence of third party culpability was reasonably available, Demby's failure to discover and present such evidence would tend to suggest his strategic decision to rely solely on a lingering doubt defense was an ill-considered choice, unsupported by a reasonable investigation. Accordingly, we conclude evidence of third party culpability was properly admitted and considered by the referee, as it was within the scope of our order of reference.

We turn now to petitioner's allegations in this proceeding and an assessment of the referee's findings following the contested evidentiary hearing in *Hardy I.*

### B. *The Allegations*

Petitioner makes a number of allegations in support of his twin claims that (1) he is innocent, and (2) his trial counsel was constitutionally ineffective for failing to discover and present reasonably available evidence of Boyd's involvement in the murders, which could have created a reasonable or a lingering doubt as to petitioner's guilt. The applicable law is settled. "[W]e give great weight to those of the referee's findings that are supported by substantial evidence. (*In re Cox* (2003) 30 Cal.4th 974, 998 [135 Cal.Rptr.2d 315, 70 P.3d 313]; *In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299]; *In re Ross* (1995) 10 Cal.4th 184, 201 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) This is especially true for findings involving credibility determinations. The central reason for referring a habeas corpus claim for an evidentiary hearing is to obtain credibility determinations (*In re Scott* (2003) 29 Cal.4th 783, 824 [129 Cal.Rptr.2d 605, 61 P.3d 402]); consequently, we give special deference to the referee on factual questions 'requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying' (*In re Malone*[, *supra*,] 12 Cal.4th [at p.] 946 . . .).

"Though we defer to the referee on factual and credibility matters, in other areas we give no deference to the referee's findings. We independently review prior testimony (*In re Cox, supra*, 30 Cal.4th at p. 998, fn. 2), as well as all mixed questions of fact and law (*In re Ross, supra*, 10 Cal.4th at p. 201). Whether counsel's performance was deficient, and whether any deficiency prejudiced the petitioner, are both mixed questions subject to independent review. (*Ibid.*) Ultimately, the referee's findings are not binding on us (*In re Malone, supra*, 12 Cal.4th at p. 946; *In re Ross*, at p. 201; *In re Marquez*

(1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435]); it is for this court to make the findings on which the resolution of [petitioner's] habeas corpus claim will turn (*In re Visciotti* (1996) 14 Cal.4th 325, 349 [58 Cal.Rptr.2d 801, 926 P.2d 987]; see *In re Scott, supra,* 29 Cal.4th at p. 824)." (*In re Thomas* (2006) 37 Cal.4th 1249, 1256–1257 [39 Cal.Rptr.3d 845, 129 P.3d 49].)

Respondent is entitled to challenge the referee's findings, both on the ground that they are not supported by substantial evidence and for accuracy, and it does so in its brief filed after the hearing in *Hardy I.* The grounds for these exceptions are largely duplicated in respondent's return in *Hardy II,* wherein it denies most of the allegations in the *Hardy II* petition. Unless otherwise stated, we consider these objections together.

With these rules in mind, we examine petitioner's factual allegations.[8]

### 1. *Boyd's Admissions*

Petitioner alleges Calvin Boyd made incriminating admissions to several people, strongly suggesting he had participated in the murders. As we describe below, various witnesses testified at the evidentiary hearing and, although Boyd refuted their claims, the referee found Boyd was not a credible witness. Respondent takes exception to the referee's findings as to these witnesses on the ground that Boyd testified and contradicted them, but the referee made credibility determinations to which we defer because they are supported by substantial evidence. Accordingly, we overrule respondent's exceptions. Evidence of Boyd's incriminating admissions, coupled with other evidence, could have convinced a reasonable jury to entertain some doubt as to the extent of petitioner's participation in the murders.

### a. *Raynall Burney*

Raynall Burney was a resident of the Vose Street apartments at the time of the murders. Petitioner alleges that "[s]hortly before the killings, Raynall Burney overheard Boyd say that he was looking for a hit man; Boyd later told Burney that he should say nothing about the conversation about the hit man." These allegations are supported by Burney's testimony at the evidentiary hearing that he heard Boyd tell a friend that "someone had asked him if he knew someone that could do a hit for this certain individual, and that they would get paid for doing it." Later, Burney overheard Boyd tell the same person not to mention the conversation to anyone.

---

[8] Respondent takes exception to many if not most of the referee's findings. To the extent certain facts found by the referee (but challenged by respondent) play little or no role in the proceedings, we do not mention them or resolve respondent's exceptions to them.

The referee specifically credited Burney's testimony, concluding that "[i]n testifying at the reference hearing, Boyd made a number of statements which were shown to be false[, including] . . . that he did not tell . . . Raynall Burney . . . that he had participated in the planning and/or the carrying out of the murders in this case." The referee also concluded that although Boyd denied making the statements overheard by Burney, "*Boyd generally lacked credibility.*" (Italics added.)

Respondent, in its return, denies Burney actually overheard Boyd make such comments, relying on Boyd's testimony in which he denied participation in the murders and claimed that, on the night of the murders, he was in his apartment, having passed out from consuming too much alcohol.[9] The referee, however, reasonably found Boyd was not credible.

Respondent takes exception to the referee's finding that Burney was credible on the grounds that Burney had suffered a 1983 felony conviction for oral copulation and had failed to come forward with his evidence at the time of trial. The referee was aware of Burney's felony conviction, but determined he was nevertheless truthful. In addition, Burney explained in his declaration why he did not come forward earlier—he was not aware petitioner faced the death penalty and would have come forward had he known—and he testified at the hearing that everything in his declaration was true. As the referee "ha[d] the opportunity to observe the witnesses' demeanor and manner of testifying" (*In re Malone, supra,* 12 Cal.4th at p. 946), information unavailable to this court, and his conclusion is supported by substantial evidence, we defer to his credibility determination (*In re Thomas, supra,* 37 Cal.4th at p. 1256).

Respondent also takes exception to the referee's finding that Burney was a credible witness on the ground that his testimony was hearsay. Respondent forfeited this claim for our review by failing to object on this ground at the hearing. Nor does it appear respondent objected to Burney's declaration. Were we to overlook this forfeiture and address the claim, we would find Boyd's comment, overheard by Burney, that someone asked Boyd "if he knew someone that could do a hit for this certain individual, and that they would get paid for doing it," was admissible under the coconspirator exception to the hearsay rule.

■ "Hearsay evidence is of course generally inadmissible. (Evid. Code, § 1200.) Hearsay statements by coconspirators, however, may nevertheless be admitted against a party if, at the threshold, the offering party presents

---

[9] Respondent's further contention that Burney never mentioned a "hit man" per se, but merely testified that he heard Boyd ask a friend "if he knew someone that could *do a hit* for this certain individual, and that they would get paid for doing it" (italics added), is frivolous.

'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' [Citations.] Once independent proof of a conspiracy has been shown, three preliminary facts must be established: '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.' " (*People v. Hardy, supra,* 2 Cal.4th at p. 139.)

Evidence Code section 1223 provides in pertinent part: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [and] [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy."

The information, as amended, alleged that Morgan, Mark Reilly and petitioner "conspire[d] together and with other persons including but not limited to Colette Mitchell, Ron Leahy, *Calvin Boyd* and Debbie Sportsman, to commit the crime of [m]urder for the purpose of collecting life insurance proceeds upon the life of Nancy Carol Morgan and Mitchell Raymond Morgan and to do so by defrauding the Equitable Life Assurance Company and the Provident Alliance Life Assurance Company." (Italics added.) There was thus no question at trial that Boyd was a coconspirator, i.e., that he was "participating in a conspiracy." Boyd's comment, overheard by Burney, plainly betrays planning behavior in furtherance of the conspiracy (see *People v. Brawley* (1969) 1 Cal.3d 277, 288 [82 Cal.Rptr. 161, 461 P.2d 361] [statements construed as attempts to recruit a person to join the criminal scheme are in furtherance of the conspiracy]) and thus would not have been barred by the hearsay rule had respondent objected on that ground. Accordingly, we overrule respondent's exceptions and adopt the referee's finding on this point.

Respondent next takes exception to the referee's conclusion that "[t]he testimony of Raynall Burney indicated that, shortly before the killings, Burney overheard Boyd say that *he* was looking for a hit man." (Italics added.) Respondent argues that Burney's testimony indicates only that he overheard Boyd say that someone had asked him (i.e., Boyd) if he knew a hit man, not that Boyd was himself searching for one. We agree and sustain this exception.

### b. *Rickey Ginsburg*[10]

Petitioner alleges that "a few days before the killings, Boyd and Marcus tried to recruit Ollie Epps, another one of Boyd's friends, to help with the killings." This allegation is supported by the testimony of Rickey Ginsburg, who at the time of the crimes resided with his mother at the Vose Street apartments. Ginsburg testified that Epps, his mother's boyfriend, told him that Boyd and Marcus had attempted to recruit him, but he had declined. Respondent denies the allegation, relying on Boyd's testimony denying he had asked anyone to commit the murders. Other than to conclude Boyd was generally not credible, the referee made no specific findings regarding Boyd's alleged attempt to recruit Epps. Accordingly, we assign this fact no weight.

Petitioner also alleges that after the murders, Ginsburg "overheard Boyd say to Ollie Epps that he (Boyd) had 'tripped upon the kid and grabbed a pillow and put it over his face and stabbed him.'" This allegation is supported by Ginsburg's testimony that, sometime after the murders, he was shooting pool with Boyd, Epps and others, and he heard Boyd tell Epps: "Yes, man, I went in to do the lady in and Marcus and I were stumbling through the house, and I went through one room, I tripped upon the kid and grabbed a pillow and put it over his face and stabbed him." The referee found the allegation to be true, concluding that, "[i]n testifying at the reference hearing, Boyd made a number of statements which were shown to be false[, including] . . . that he did not tell . . . Ollie Epps [or] Rick Ginsburg . . . that he had participated in the planning and/or *the carrying out of the murders* in this case." (Italics added.)

Respondent denies Ginsburg actually overheard Boyd make these incriminating comments; in support, respondent argues that Boyd testified and denied participation in the murders, Ginsburg's credibility is suspect because he has a felony conviction for selling cocaine, Ginsburg failed to give police this information when they interviewed him around the time of the crimes, and Ginsburg never told his mother about the incident although for him to conceal such important information from her would have been unusual.[11] Respondent also formally takes exception to the referee's findings, arguing Ginsburg's testimony was not credible.

---

[10] Ginsburg's mother's name is Marcia King, although she was also known as Marcia Sanders. Rickey Ginsburg is referred to in defense counsel's investigation reports as "Rickey Sanders."

[11] The parties stipulated that Rickey Ginsburg's mother, Marcia King Sanders, if called to testify, would say she was living at the Vose Street apartments around the time of the murders and that her son "never told her that he . . . had any information about Calvin Boyd being involved in the murders of Nancy or Mitchell Morgan."

Although Boyd denied making the statements overheard by Ginsburg, the referee found that *"Boyd generally lacked credibility."* (Italics added.) The referee also specifically credited Ginsburg's testimony on this point. This was a classic credibility determination to which we defer, inasmuch as the referee's conclusion on this point is supported by substantial evidence, namely, Ginsburg's own testimony. We thus overrule respondent's exceptions and adopt the referee's findings.

Petitioner also alleges that after the murders, Boyd told Ginsburg in a threatening manner to tell the police he knew nothing about them. This allegation is supported by Ginsburg's testimony that sometime after he was interviewed by the police, Boyd confronted him and said: " 'And what did you tell them? And what do you know? And now you know nothing.' " Ginsburg took these comments to be a threat. The referee found "[t]he evidence showed that, at some point after the killings, . . . Boyd told Ginsburg [in a threatening manner that] he should tell the police that he knew nothing about the killings." As noted, the referee specifically credited Ginsburg's testimony and found "Boyd generally lacked credibility."

Respondent impliedly denies this allegation in its return, alleging: "Boyd did not tell . . . Rickey Ginsburg . . . that he committed one or both of the murders." We may assume respondent's attack on Ginsburg's credibility applies here as well. Respondent also takes exception to the referee's finding that Boyd threatened Ginsburg. The referee, however, reasonably weighed Ginsburg's credibility against that of Boyd and, inasmuch as Ginsburg testified specifically that Boyd threatened him, substantial evidence supports the referee's finding. We thus overrule respondent's exception. Respondent's further exception to the referee's description of the exact nature of the threat is meritless: That Boyd said, " 'And now you know nothing,' " in context, was reasonably construed as a threat.

Respondent also takes exception to the referee's finding regarding Ginsburg because his testimony recounting Boyd's threat was inadmissible hearsay. It is unclear whether respondent properly objected on this ground. Although respondent made a continuing hearsay objection during Ginsburg's testimony, that objection could be construed as applying only to Ginsburg's testimony regarding the comments of Ollie Epps. As the matter is unclear from the record, however, we give respondent the benefit of the doubt and conclude the issue is preserved for our review. (*People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93], overruled on another point in *People v. Combs* (2004) 34 Cal.4th 821, 860 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

Turning to the merits of the hearsay question, we conclude Boyd's threat to Ginsburg falls under the coconspirator exception to the hearsay rule. (See

discussion, *ante*, at pt. IV.B.1.a.) Although the threat was made after the crimes had occurred, there is no question Boyd's statement was made "while" he was engaged in the conspiracy. As we explained on appeal: "The conspiracy did not . . . end with the death of the insureds. Instead, for purposes of this case, it continued until the coconspirators received the insurance proceeds [citation], or Morgan was convicted of unjustifiable homicide of the victims, thus disabling him from legally collecting the insurance proceeds. [Citation.] Because the insurance companies had not yet paid out at the time of trial, the conspiracy was a continuing one, permitting the introduction of hearsay statements made during the time between the crime and the trial, pursuant to Evidence Code section 1223." (*People v. Hardy, supra,* 2 Cal.4th at p. 144, fn. omitted.)

Respondent contends Boyd's threat to Ginsburg was not uttered in furtherance of the objective of the conspiracy. Although respondent's argument lacks detail, we conclude Boyd's threat not to reveal his name to the police was a clear attempt to avoid detection and thus protect the aims of the conspiracy. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1231 [283 Cal.Rptr. 144, 812 P.2d 163] [statements fell within the coconspirator exception because they "could reasonably be viewed as an attempt to commit a potential witness to silence, thereby concealing the murder"].) We thus conclude that, assuming respondent preserved this issue, the referee properly admitted the evidence over the hearsay objection.

As the referee's conclusions with regard to Ginsburg are supported by substantial evidence, they are entitled to deference and we adopt them.

### c. *James Moss*

Petitioner alleges that after the murders, James Moss had a conversation with Boyd in which Boyd said he was angry with petitioner because petitioner had failed to show up for something, that Boyd had to go in his place, that Marcus had to drive the getaway car, and that Boyd later told Moss to forget the conversation. Moss, who now lives in Tennessee, testified that he lived at the Vose Street apartments in 1981 and knew Boyd as well as Boyd's wife, Arzetta Harvey. Moss testified that sometime after the crimes, after he had learned of Reilly's arrest for the murders, Moss, Boyd and Marcus were milling around the swimming pool at the apartment complex when Boyd said he was angry because petitioner had not shown up to do something he was supposed to do and Boyd had to go in his place. Boyd criticized petitioner's courage, saying he "was too chicken shit to go along." Boyd was angry because "he needed his part of the money to get the drugs that he wanted and needed." Marcus added that petitioner "mess[ed] the whole thing up because he didn't go, [and] that if they got caught, [petitioner]

would get away free because he did not—you know, he did not go, he did not show up to do what they was supposed to do." Boyd echoed this sentiment, saying that if Boyd were arrested, petitioner would "walk away free because he did not do anything." Marcus said that as a result of petitioner's failure to show up, he (Marcus) had to drive the getaway car. Sometime after the poolside conversation, Boyd told Moss to forget it had taken place. Moss admitted on cross-examination that, at the time, he did not know what Boyd and Marcus were talking about and did not know they may have been referring to the murders. Boyd specifically denied Moss's account of the alleged conversation.

The referee specifically credited James Moss's testimony on this point, concluding that, "[i]n testifying at the reference hearing, Boyd made a number of statements which were shown to be false[, including] . . . that he did not threaten, bully, pressure or otherwise try to intimidate any of the Vose Street residents . . . [and] that he did not tell . . . James Moss that he had participated in the planning and/or the carrying out of the murders in this case."

Respondent denies that Moss heard Boyd make these incriminating comments, noting that Moss admitted he did not know what Boyd was talking about and that Moss had a motive to testify falsely because his present wife, then 21 years old, had had a one-day affair with Boyd's stepson, who was only 15 or 16 years old at the time. In addition, respondent alleges Moss's failure to come forward until now undermines his credibility. Respondent takes exception to the referee's findings on these same grounds.

The referee concluded that although Boyd denied making the statements reported by Moss, "Boyd generally lacked credibility." The referee's decision to credit Moss's testimony and not Boyd's is a credibility determination to which we must defer if supported by substantial evidence. We conclude that it is, namely, the testimony of James Moss himself and that of Sandra Harris Moss, who testified that she had immediately apologized to Arzetta Harvey about her affair with Harvey's son and that their friendship was back to normal within 24 hours.

Respondent takes exception to the referee's finding concerning Moss's testimony recounting Boyd's admissions, contending the comments were inadmissible hearsay. Respondent failed to object on this ground and thus failed to preserve the issue for our review. Were we to overlook this forfeiture and address the claim, we would find Boyd's comment, warning Moss that he should forget the conversation he had heard, was admissible under the coconspirator exception to the hearsay rule. (See discussion, *ante*, at

pt. IV.B.1.a.) Like the threat to Ginsburg, Boyd's warning to Moss was an attempt to shield the conspiracy from discovery. (*People v. Sully, supra,* 53 Cal.3d at p. 1231.)

Boyd's other comments, overheard by Moss, that petitioner had not shown up for something he was supposed to do, that Boyd went in his place, that petitioner "was too chicken shit to go along," and that Boyd "needed his part of the money to get the drugs that he wanted and needed" require a different analysis for they do not appear to have been uttered in furtherance of the conspiracy. We find, however, that these comments were admissible because they recounted Boyd's prior inconsistent statements. Evidence Code section 1235 provides in part: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing . . . ." Boyd testified at trial that he did not kill the victims, had not agreed to kill the victims, was never asked to do it, had never told Reilly "that Marcus had backed out" or that he (Boyd) would do the killing, and that no agreement existed whereby he was to receive money in return for the murders. At the evidentiary hearing, he similarly maintained he was completely innocent of the murders and uninvolved in the conspiracy.

In light of these denials, James Moss's testimony was admissible under Evidence Code section 1235 as evidence of Boyd's prior inconsistent statements. Even if respondent had preserved this issue, therefore, the referee would properly have admitted the evidence over the hearsay objection. We thus overrule respondent's exceptions and adopt the referee's conclusions regarding James Moss's evidence.

d. *Michael Small/Sandra Harris Moss*

Petitioner alleges that sometime after the murders, Boyd told Michael Small he had killed a child and would do it again; that he took a pillow, put it over the child's face and stabbed him through the pillow; and that he expected to receive a large sum of money. These allegations are supported by the testimony of both Small and Sandra Harris Moss, then known as Sandra Harris. Small, now a minister living in Kentucky, testified that he lived at the Vose Street apartments in 1981 and was friends with Arzetta Harvey's son (Boyd's stepson). Small observed an altercation between Boyd and Raynall Burney in which Boyd drew a knife and said: "I play for keeps. I have already taken out one young kid. I can do the same." Boyd made these statements after the Nancy and Mitchell Morgan murders. A few days later, Small asked Boyd whether his comments were true and Boyd replied in the affirmative, explaining: "I took the pillow and I put it over him and I just stabbed him." The conversation was "[v]ery vivid" in Small's memory. At one point, Boyd said he expected to receive a "large sum" of money, but later

said the money he was expecting to receive "wasn't there." Sandra Harris Moss testified that Arzetta Harvey, Boyd's wife, told her Boyd was expecting to receive some insurance money, although in her testimony Harvey denied the account. Boyd denied making the statements to Small or making any statements with regard to insurance proceeds.

At the hearing, respondent emphasized that there was a discrepancy between Small's declaration (introduced without objection) and his testimony, in that his declaration made no mention of Boyd's admitting to killing a child. Small explained that he had told the defense investigator who prepared the declaration that, in light of the many years that had passed, he might still remember some additional facts. Respondent fully cross-examined Small regarding the discrepancy. Regarding why he did not immediately come forward with his evidence, Small testified that he initially declined to go to the police because he feared Boyd, that he then left the state for a few months for a military commitment, and that when he returned to California, he heard nothing more about the murders.

The referee specifically credited Small's testimony on these points and concluded Boyd's denials were not credible, stating that "[i]n testifying at the reference hearing, Boyd made a number of statements *which were shown to be false*[, including] . . . that he did not threaten, bully, pressure or otherwise try to intimidate any of the Vose Street residents . . . [and] that he did not tell . . . Michael Small . . . that he had participated in the planning and/or the carrying out of the murders in this case." (Italics added.) The referee also found Arzetta Harvey's testimony (denying she had told Sandra Harris Moss that Boyd was coming into some insurance money) "to be unreliable."

Respondent in its return denies these allegations concerning Boyd's statements to Small and also takes exception to the referee's findings, on a number of grounds. First, respondent argues the discrepancy between Small's declaration and his hearing testimony, as well as his failure to come forward earlier, indicates he was not credible. Small addressed these points in his testimony. Respondent adds that Small's credibility is further undermined because Burney in his testimony never mentioned that Boyd said he had killed a child by stabbing him. Although Raynall Burney's failure to mention that Boyd had admitted to killing a child tends to undermine Small's testimony, this is the type of credibility assessment we commit to the referee, and he specifically found Boyd was not truthful when he denied telling Small about his involvement in the murders. Because the referee's credibility determination is supported by substantial evidence, namely Small's own testimony and his declaration, it is entitled to deference. (*In re Thomas, supra,* 37 Cal.4th at p. 1256.) Accordingly, we overrule respondent's exceptions.

Second, respondent takes exception to the referee's acceptance of Small's testimony, on grounds his credibility was undermined by (1) his claim he was an "ordained" minister of the Jehovah's Witnesses faith, when in fact his Kingdom Hall does not use that title, and (2) when he was 17 years old, he obtained an identification card from the Department of Motor Vehicles with a false birth date. These matters were fully aired at the hearing, with Small explaining the circumstances of each, and we assume the referee considered them in weighing Small's credibility against that of Boyd. Because the referee's credibility determination is supported by substantial evidence, namely Small's own testimony, it is entitled to deference. (*In re Thomas*, *supra*, 37 Cal.4th at p. 1256.) Accordingly, we overrule these exceptions.

Third, respondent takes exception to the referee's findings with regard to Small's testimony, on the ground that evidence Small was afraid of Boyd, that Boyd "lived the life of a gangster," and that other Vose Street residents were afraid of Boyd was inadmissible evidence of Boyd's bad character. Because respondent did not object to Small's testimony on this ground, it has forfeited the claim in this court. In any event, the testimony was admissible to show Small's state of mind, which was relevant to show his fear of Boyd and thus his reluctance to come forward until years later. We thus overrule this exception.

Fourth, respondent takes exception to the referee's finding that Boyd ever told anyone he was expecting to receive money from some insurance proceeds or that Harvey had mentioned anything about such money to Sandra Harris Moss, arguing that no evidence supports the proposition that Boyd told this to Small personally. Respondent is mistaken, as Small so testified. We thus overrule this exception.

Fifth, respondent takes exception to the referee's finding that Arzetta Harvey told Sandra Harris Moss that she and Boyd expected to get some insurance money "soon." The referee's interpretation of the evidence is reasonable; Sandra Harris Moss testified that Harvey had said she and Boyd were "coming into some insurance money," and, in context, Moss reasonably understood the use of the colloquial phraseology to mean "soon" and not at some distant future time. We thus overrule this exception.

Sixth, respondent takes exception to the referee's finding crediting Small's testimony recounting Boyd's admissions, contending the comments were inadmissible hearsay. Respondent failed to object on this ground and thus failed to preserve the issue for our review. Were we to overlook this forfeiture and address the claim, we would find Boyd's comments that (1) with a drawn knife, he told Raynall Burney (overheard by Small): " 'I play for keeps. I have already taken out one young kid. I can do the same' "; (2) he told

Small: "I took the pillow and I put it over him and I just stabbed him"; and (3) he told Small he (Boyd) expected to be receiving a large sum of money, all were admissible under Evidence Code section 1235 because they recounted Boyd's prior inconsistent statements. (See discussion, *ante*, at pt. IV.B.1.c.) We thus conclude that, even had respondent preserved this issue, the referee would properly have admitted the evidence over the hearsay objection.

As the referee's conclusions concerning the testimony of Michael Small and Sandra Harris Moss are supported by substantial evidence, namely, the testimony of Small himself as well as that of Sandra Harris Moss, we overrule respondent's exceptions and adopt the referee's conclusions.

### e. *Michael Mitchell*

Petitioner alleges that a few days after the murders, Boyd demanded from codefendant Reilly a share of the insurance proceeds. This allegation is supported by the testimony of Michael Mitchell, who testified that he was Reilly's roommate at the Vose Street apartments in 1981. Mitchell answered in the affirmative when he was asked whether Reilly told him a few days after the murders "that [Boyd] had actually threatened him because he wanted his cut for the killing." Respondent denies these allegations.

The referee made no specific findings as to this particular alleged threat Boyd issued to Reilly, or whether Mitchell was telling the truth, although he made the related finding that "Boyd told [Michael] Small that he expected to receive a large sum of money," that Boyd was not credible when he denied threatening or trying to intimidate any Vose Street residents, and that "Boyd generally lacked credibility." Because the referee failed to make a specific finding with regard to the allegation based on Michael Mitchell's testimony, we are left with disputed factual allegations, the resolution of which would require another evidentiary hearing. Accordingly, for purposes of the present case, we will ignore the allegation based on Michael Mitchell's testimony at the evidentiary hearing.

### f. *Steven Rice*

In 1981, Steven Rice lived at the Vose Street apartments in an apartment next to Reilly's. Rice was allowing petitioner to live with him rent free. Petitioner alleges that "at some point after the killings," Boyd entered Rice's apartment, began beating Rice, and warned him that he should not mention Boyd's name to the police or Boyd would kill him. These allegations are supported by Rice's testimony. Rice, who now lives in Utah, testified he was friends with the Hardy family and lived in the Vose Street apartment with

petitioner in 1981. He testified that about two weeks after the murders, Boyd entered his apartment while he was sleeping, began hitting him in the face, and told him not to mention his name to the police "or he was going to kill my white ass." Boyd denied threatening Rice in this manner.

The referee found "[t]he evidence showed that, at some point after the killings, Boyd came into Steve Rice's apartment while he was asleep and began hitting Rice, telling him 'he better not mention his name [to the police] or he was going to kill [Rice's] white ass.' " As noted, the referee specifically found Boyd lied when he denied threatening and intimidating the Vose Street residents and that he "generally lacked credibility."

Respondent denies Boyd ever threatened Rice not to go to the police and also raises a number of exceptions to the referee's findings regarding Rice. First, respondent takes exception to the referee's findings on the ground that Rice never mentioned to the police investigating the murders that Boyd had threatened him, although he had opportunities to do so. Although that fact tends to undercut Rice's credibility, we note Rice testified that Boyd threatened him with harm should he reveal Boyd's involvement. In addition, Rice states in his declaration that he complained several times to the police about Boyd's attempt to retaliate against him, and the police did nothing in response.[12] In agreeing with Rice and not Boyd, the referee made a classic credibility determination that is entitled to deference if supported by substantial evidence. Because the referee's decision is supported by Rice's own testimony and his declaration, we overrule this exception.

Second, respondent takes exception to the referee's findings on the ground that Rice's testimony regarding Boyd's assault on him was inadmissible evidence of bad character. (Evid. Code, § 1101.) Respondent did not object on this ground at the hearing and thus forfeited its consideration in this court. In any event, Rice's testimony was admissible under the coconspirator exception to the hearsay rule because it was an attempt to keep the conspiracy from being discovered and its ends thwarted, while it was still an ongoing enterprise. (See discussion, *ante*, at pt. IV.B.1.a.)

---

[12] For example, Rice declared that after Boyd broke into his apartment and threatened him, Rice began sneaking into his apartment through a window so as to avoid meeting Boyd. Although Rice asked the police for protection against Boyd, "they did nothing" and "[t]hey did not take me seriously." Rice declared that a few days later, Boyd and Marcus confronted him in the Vose Street apartment's parking lot and chased him, but he escaped. "I never returned to my apartment after that because I was afraid for my life and the police did nothing to protect me from [Boyd]. Finally, I decided just to leave the state and move in with my father in Wyoming." Although respondent objected to the declaration at the hearing, it is unclear whether it raises the same objection before this court. In any event, the content of the declaration was largely duplicated by Rice's hearing testimony.

Third, respondent takes exception to the referee's finding that when Demby interviewed Rice, he *"repeatedly* told Mr. Demby that after the killings, Boyd had physically attacked him and ordered him not to mention his (Boyd's) name to the police." (Italics added.) We have reviewed the transcript of the interview (which was admitted without objection) and are satisfied the referee's conclusion on this point is accurate. We thus overrule this exception.

As the referee's conclusions regarding Rice's evidence are supported by substantial evidence, namely the testimony of Rice himself as well as his declaration and the transcript of his interview with defense counsel, the referee's conclusions are entitled to deference, and we adopt them.

### 2. *Boyd Habitually Carried a Knife Similar to the Murder Weapon*

In addition to Boyd's numerous incriminating statements, petitioner also presented evidence that Boyd habitually carried and brandished a knife similar to the murder weapon. The victims were killed with a knife approximately six inches long and one-half inch wide. Petitioner alleges that had trial counsel conducted a reasonable investigation, he would have discovered that Boyd habitually carried a knife of substantially similar dimensions as the murder weapon. The testimony of several witnesses supports this allegation. For example, Rickey Ginsburg testified Boyd habitually carried a knife about seven inches long. Wesley Frank, another resident of the Vose Street apartments in 1981, testified Boyd carried a dagger, sharp on one side only, but stopped wearing it after the murders. Raynall Burney testified Boyd kept a knife in his back pocket or on his belt. He saw Boyd with a switchblade-style knife about six inches long and one-half inch wide. Also testifying that Boyd habitually carried a knife were Steven Rice, Michael Mitchell, Michael Small, James Moss and Sandra Harris Moss.

Respondent denies that Boyd carried a knife of the same dimensions as the murder weapon. It emphasizes the difference between a single-bladed knife and a stiletto (which is sharp on both sides of the blade), and asserts the expert testimony at petitioner's trial indicated the victims were killed with a stiletto. Although expert testimony indicated the victims were killed by the same or similar knives and it appeared from the wounds the knife was sharp on both sides of the blade, the referee made no finding on whether the knife Boyd carried was of the same dimensions or characteristics as the murder weapon. The referee did conclude, however, that Boyd carried a knife around the time of the murders and that Boyd's testimony "that he did not possess [or] carry . . . a knife during the time he lived at the Vose Street apartments" was false. Moreover, only Wesley Frank specified that the knife he saw Boyd carrying was sharp on one side only. None of the other witnesses related this

detail, although some reported the length and width of the blade as being consistent with the murder weapon.

Respondent also takes exception to the referee's finding that Boyd habitually carried a knife, arguing evidence he did so was improperly admitted at the hearing because it was evidence of his bad character. Respondent did not object to the evidence on that ground and must be held to have forfeited the claim in this proceeding. Respondent's further exception that a drawing of the knife used at the hearing was not drawn to scale must suffer the same fate. Accordingly, we overrule respondent's exceptions.

There being substantial, indeed overwhelming, evidence to support the referee's finding that Boyd habitually carried a knife around the time of the murders, we adopt it.

### 3. *Boyd Had Previously Committed Several Assaults with a Knife*

Petitioner alleges that had trial counsel conducted a reasonable investigation, he would have discovered that Boyd, on numerous occasions, threatened various people with a knife and admitted having stabbed people in the past. Thus, petitioner alleges, Boyd several times threatened his wife, Arzetta Harvey, with a knife. This allegation is supported by Harvey's testimony admitting Boyd threatened her with a knife and that he once put a knife to her throat and threatened to kill her. Harvey's son testified that Boyd, during an argument, brandished a knife, chased Harvey and threw a knife at her. Raynall Burney described a different incident; he saw Boyd arguing with Harvey and then point the knife at her side in a threatening manner.

The record also supports petitioner's further allegations that Boyd once brandished a knife at Raynall Burney, as well as at a group of people gathered around the swimming pool at the Vose Street apartments, including Michael Small and others, and that Boyd bragged he previously had cut someone's throat. Although Boyd denied these incidents, the referee ruled generally in petitioner's favor on this point.

Respondent does not specifically deny that any of these events occurred but contends that because the victims were killed with a two-bladed knife, the testimony recounting incidents in which Boyd threatened Burney, Harvey and Small with a knife was "irrelevant and immaterial." Respondent also takes exception to the referee's findings, arguing they are incorrect and based on inadmissible evidence, being merely evidence of Boyd's bad character. Respondent did not object on these grounds at the reference hearing and thus failed to preserve the issue for review in this court. Accordingly, we overrule respondent's exception to these latter statements.

There being substantial evidence (in the form of testimony by Harvey, her son, Burney and Small) to support the referee's finding that Boyd threatened people with, and brandished, a knife on several occasions, and because respondent forfeited the evidentiary objections it now presents, we adopt the referee's conclusions.

### 4. *Boyd Had a Reputation for Violence and Threatening Behavior*

Relying on many of the same facts, petitioner alleges that had trial counsel conducted a reasonable investigation, he would have discovered that Boyd had a reputation for violence and a history of violent and threatening behavior. With the exception of evidence relevant to Harvey's and her son's states of mind (Evid. Code, § 1101, subd. (c)), such evidence would have been inadmissible at trial on the question of Boyd's character (*id.*, § 1101), and thus counsel cannot have been ineffective for failing to discover and present it.

### 5. *Boyd Had Cuts on His Hands After the Killings*

Petitioner alleges that had trial counsel conducted a reasonable investigation, he would have discovered that shortly after the murders, Boyd had numerous cuts on his hands and told a false story in an attempt to explain them. Testimony at the evidentiary hearing supports this allegation: James Moss testified that shortly after the murders, when he overheard Boyd and Marcus make incriminating comments about their complicity in the murders, he noticed Boyd's hands were "partially wrapped" and he had cuts on his hands and "puncture wounds up around the knuckles." The cuts looked like they could have been made by a knife. Steven Rice testified that shortly after the murders, he noticed Boyd had a cut on his knuckles as if he had "punched something." Sandra Harris Moss testified that shortly after Reilly was arrested, she noticed Boyd had a long cut on his right hand, near the knuckle, that looked infected. Boyd told her he had injured it working with a friend on a car engine. Boyd testified he did not recall having any cuts on his hands in the days following the murders and denied having injured himself working on a car, admitting, "I was never a mechanic." Arzetta Harvey testified she did not recall seeing any cuts on Boyd's hands around the time of the murders.

The referee noted that "several witnesses noticed cuts on Boyd's hands" in the days following the crimes and concluded Boyd's denial that he had cuts on his hands was not credible and was, in fact, "false."

Respondent denies petitioner's factual allegations, relying on Boyd's and Harvey's testimony at the evidentiary hearing, and further contends that even

if Boyd had the alleged cuts, it does not prove he was the murderer or that petitioner was innocent of the murders, as there was no evidence indicating the circumstances under which Boyd had sustained the cuts or whether the victims' killers had cut their hands during the crimes. Respondent takes exception to the referee's findings on the same grounds. Although having cuts on his hands just after the brutal double murder and telling a falsehood as to their origin does not prove definitively that Boyd was the murderer, this evidence is certainly relevant, especially as to Boyd's state of mind and, coupled with other evidence such as his incriminating admissions, could have convinced the jury to entertain some doubt as to the scope of petitioner's involvement in the murders. We thus overrule respondent's exceptions.

Substantial evidence (i.e., the testimony of James Moss, Steven Rice and Sandra Harris Moss) supports the referee's findings regarding the cuts on Boyd's hands. Accordingly, those findings are entitled to deference, and we adopt them.

### 6. *Boyd's Alibi Was False*

Boyd had an alibi for the night of the murders: His wife, Arzetta Harvey, testified at the preliminary hearing that she had purchased some bedroom furniture from her friend, Sandra Harris Moss, and moved it to her apartment on May 20, 1981, the day before the victims were murdered. Harvey testified at the preliminary hearing that Boyd came home drunk that night and passed out on the new bed around 11:00 p.m. (Recall the victims were killed in the early morning hours on May 21, 1981.) Boyd himself testified that someone must have slipped him an intoxicating substance that night without his knowledge, resulting in his passing out.

Petitioner alleges that had trial counsel conducted a reasonable investigation, he would have discovered Boyd's alibi was false. Testimony at the evidentiary hearing supports this allegation: Sandra Harris Moss testified that on the day she sold her bedroom furniture to Harvey and helped her move it into her bedroom, she saw Boyd on the bed late that evening, but contrary to Harvey's preliminary hearing testimony, the night she saw Boyd on the bed could have been any night, and she did not know whether it was the night of the murders. Suspiciously, after the murders, Harvey put pressure on Moss nearly every day to say the night she saw Boyd on the bed was the night of the murders. Harvey, at that time Moss's good friend, had never pressured Moss about anything, but uncharacteristically brought up this subject every day "like a ritual." Moss "felt as though [Harvey] was pressuring me and brainwashing me to remember that the night that I sold her the bedroom set and the night that we moved the bedroom set was the night that [Boyd] was at home laying [on] the bed." Arzetta Harvey's son testified consistent with

Moss's account, asserting that Boyd asked him to lie to the police and tell them that he (Boyd) was home the night of the murders. Harvey denied badgering Moss to give Boyd an alibi, but admitted at the evidentiary hearing that she did not know if she had bought the bedroom set around the time of the murders or not.

Other evidence undermined Boyd's alibi as well. Although Boyd claimed he had passed out in his and Harvey's apartment the night of the murders, three witnesses reported seeing him in the common areas of the apartment complex that evening. Wesley Frank, a resident of the Vose Street apartments, testified that on the evening of May 20, 1981, he saw Boyd and Marcus at the Vose Street apartment complex around 8:00 or 9:00 p.m., standing in a stairway and talking. Later, between 10:00 and 11:00 p.m., he heard Marcus start up his motorcycle and then heard Marcus and Boyd arguing. Boyd said: " 'I don't want to get on the back of the bike. I'll fall off.' " Nevertheless, Frank saw the two men leave on the motorcycle with Boyd on the back. They were dressed in dark clothing and appeared sober. In addition, Rickey Ginsburg testified he saw Boyd and Marcus in the late evening that same night, between two buildings of the apartment complex. They asked to borrow his car but Ginsburg declined, instead loaning them some money. Finally, Colette Mitchell, petitioner's then girlfriend, told police she was in Reilly's Vose Street apartment that critical night and saw Boyd walk by Reilly's apartment window around 11:00 p.m.

The referee concluded the evidence presented at the hearing "undermined Boyd's purported alibi for the night of the killings and supported petitioner's contention that Boyd was the killer." Critically, the referee specifically found Boyd's testimony "that he did not leave the Vose Street apartments with Marcus on the night of the murders" was false and that Arzetta Harvey's testimony about Boyd's alibi was "unworthy of belief."

Respondent denies the allegation that Boyd's alibi was false, relying on Boyd's denial and Harvey's testimony. The referee specifically disbelieved Boyd and Harvey, however, making a credibility determination that is entitled to this court's deference.

Respondent takes exception to a number of the referee's findings. First, it argues the referee's findings are "incomplete" because they fail to note the contrary evidence, to wit, that Sandra Harris Moss initially told police she had seen Boyd passed out on the bed the night of the murders. The referee was undoubtedly aware of Moss's earlier position when he weighed her past representation to police with her contrary testimony at the reference hearing. The referee's conclusion that Moss was truthful at the hearing, and that Boyd and Harvey were not credible, is the type of credibility determination that is entitled to our deference. Accordingly, we overrule this exception.

Second, respondent argues any reliance on Colette Mitchell's transcribed interview with the police is improper because it was inadmissible, both because it was hearsay and because it was polygraph-related, being an interview conducted in connection with a polygraph test. The transcript of this interview was admitted without objection at the hearing but, inasmuch as the referee's conclusion regarding Boyd's false alibi is sufficiently supported by Ginsburg's and Frank's testimony in any event, we assign Colette's interview transcript no weight.

Respondent's third exception challenges Sandra Harris Moss's testimony concerning Harvey's attempt to pressure her on the ground that Moss's testimony was not "uncontradicted." The argument is meritless. Although the point was contested and our July 20, 1994, order asked the referee to determine why Demby failed to present "the *uncontradicted* evidence of other available witnesses who would have provided mitigating evidence at the penalty phase of the trial" (italics added), the referee was also directed by our order to take evidence and determine whether Demby's tactical decision not to present this evidence was "supportable." The relative strength of the evidence of third party culpability was relevant to determining whether Demby's decision not to present it was supportable. We thus overrule this exception.

Fourth, respondent takes exception to the referee's conclusion that Sandra Harris Moss told her then boyfriend, James Moss, that Harvey was putting pressure on her to support Boyd's alibi. Respondent claims no evidence supports this conclusion because James Moss's testimony to that effect was not admitted for its truth. Although respondent is correct that James Moss's testimony on this point was not offered for its truth, it is mistaken that no other evidence supports the referee's conclusion. Sandra Harris Moss herself testified that she told James Moss that Boyd and Harvey were trying to "brainwash" her into believing the night she saw Boyd passed out was the night of the murders. We thus overrule this exception.

Fifth, respondent takes exception to the referee's conclusion that Harvey's son falsely gave police petitioner's name at Boyd's urging because he was afraid of Boyd. Although respondent contends the evidence supporting this conclusion is ambiguous, the record strongly supports the referee's finding. For example, Harvey's son affirmed that Boyd approached both him and his mother and told them they "should tell a certain story to police." Regarding the fact he told police he had heard petitioner was the killer, Harvey's son admitted: "That is what I was told by Calvin to say." Ample evidence also supports the notion that Harvey's son feared Boyd. He testified he believed Boyd was a violent person, based on Boyd's violent abuse of his mother, Arzetta Harvey, his slapping, hitting, verbally yelling "and just constantly

coming home drunk, taking it out on me and my mother." He also related an incident in which Boyd had threatened them with a knife. Given this evidence, the referee was well within his discretion to conclude that Harvey's son was afraid of Boyd.

Respondent also takes exception to the referee's findings regarding Harvey's son on the ground that his credibility was compromised because he had sustained two felony convictions and because he did not come forward earlier with his evidence. We have no doubt the referee considered these factors when assessing the witness's credibility. As the referee's conclusion on this point is supported by substantial evidence, it is the type of credibility determination that is entitled to deference. (*In re Thomas, supra,* 37 Cal.4th at p. 1256.) We thus overrule respondent's exceptions regarding Harvey's son's testimony.

Sixth, respondent takes exception to the referee's finding that the evidence undermines Boyd's alibi, arguing that other evidence supports the alibi. This is a factual determination well within the referee's discretion to make. Accordingly, we overrule the exception.

Seventh, respondent takes exception to the referee's finding that the evidence undermines Boyd's alibi, arguing that Harvey's son's testimony that Boyd had coerced him to support the alibi was hearsay evidence of Boyd's bad character, inadmissible under Evidence Code sections 1101 to 1103. Although respondent objected to Harvey's son's testimony that Boyd had a reputation for violence, respondent did not raise a hearsay objection to his testimony that Boyd had coerced him to support Boyd's alibi. Accordingly, respondent failed to preserve the hearsay objection for this court's consideration. In any event, Sandra Harris Moss's testimony amply supports the referee's conclusion that Boyd's alibi was false. We thus overrule the exception.

As substantial evidence (i.e., the testimony of Wesley Frank, Rickey Ginsburg, Sandra Harris Moss, James Moss and Harvey's son) supports the referee's findings that evidence presented at the hearing "undermined Boyd's purported alibi for the night of the killings and supported petitioner's contention that Boyd was the killer," and that Boyd's testimony "that he did not leave the Vose Street apartments with Marcus on the night of the murders" was false, we adopt those findings.

### 7. *Boyd Had a Motive to Commit the Murders*

Petitioner alleges that at the time of the murders, Boyd was a drug user who habitually used alcohol, marijuana, heroin, cocaine and possibly phencyclidine (PCP), and that he was unemployed and in constant need of money.

Petitioner contends this evidence provides Boyd with a motive for the killings. For example, Harvey's son testified Boyd was his stepfather in 1981 and that he had gotten to know Boyd fairly well. He said that people often came to speak with his mother about Boyd, complaining that Boyd was "constant[ly] badgering [them] for money to buy the drugs." Michael Small testified that in 1981, Boyd was often under the influence. According to Small: "[Boyd] wasn't trying to hide his drug use in any way. Over back by the pool he would smoke Sherm [i.e., PCP-laced cigarettes] or marijuana." According to Small, Boyd "always had Southern Comfort with him, and if he didn't he was going to get a bottle. So that was his recreation." Asked if this occurred every day, occasionally or just on weekends, Small replied: "All the time." James Moss confirmed that Boyd drank on a "daily basis" and that he appeared to be addicted to heroin, saying, "he was on that real bad." Sandra Harris Moss testified Boyd did not work, but "[h]ung around, loafed around" all day, drinking and smoking marijuana and "Sherm" cigarettes. Although she never saw Boyd inject heroin, she saw needle marks on his arms. James Moss testified that after the murders, he overheard Boyd say he was angry and that "he needed his part of the money to get the drugs that he wanted and needed."

The referee concluded "[t]he evidence at the hearing showed that Boyd had a motive for the killings: i.e., to obtain money to support his drug habit." Moreover, the referee found that Boyd's testimony that "he did not use . . . cocaine, heroin or PCP during the time he lived at the Vose Street apartments" was false and that the evidence confirmed "that Boyd's drug habit was his motive for participating in the conspiracy[, namely] that, after the killings, Boyd was heard to say that he wanted to be paid for his part in the killings soon so that he could buy drugs."

Without specifically denying the allegations regarding Boyd's drug addiction and impecunious circumstances, respondent denies that these alleged facts provide Boyd with any greater motive for the double murder than any other poor, unemployed person. Although respondent is correct that the presence of a motive does not prove Boyd was the killer, this evidence, combined with the other evidence, could have convinced a reasonable jury to entertain some doubt as to the scope of petitioner's involvement in the murders. Moreover, James Moss's testimony ties Boyd's drug addiction to his need for money.

Respondent also takes exception to the referee's findings, arguing the evidence showing Boyd's drug and alcohol habits was inadmissible evidence of his bad character. Respondent did not object on this ground at the hearing and has thus forfeited the claim for this proceeding. Assuming the issue was preserved, the evidence was admissible to challenge Boyd's credibility (Evid.

Code, § 1101, subd. (c)), as he testified he did not use drugs or alcohol and was not part of the conspiracy. (See discussion, *ante*, at pt. IV.B.1.g.) Respondent's further argument that no evidence supports the referee's finding that Boyd was heard to say he wanted to be paid for his part "in the killings" is meritless; James Moss's testimony, read in context, adequately supports the referee's finding. We thus overrule respondent's exceptions.

As the referee's conclusions regarding Boyd's motive for the slayings are supported by substantial evidence (i.e., the testimony of Harvey's son, Michael Small, James Moss and Sandra Harris Moss), we adopt them.

### 8. *Boyd's Postcrime Behavior Evidenced Consciousness of Guilt*

In addition to Boyd's many incriminating admissions, the suspicious cuts on his hands, his having carried a knife around the time of the murders and all the other evidence described above, petitioner also alleges that Boyd's behavior and demeanor following the murders suggested he suffered from a consciousness of guilt. For example, as described above, Boyd claimed a false alibi and pressured and threatened others to support it. In addition, Boyd threatened those who had heard him make incriminating statements to keep silent. At Boyd's urging, Harvey's son, who was only 13 or 14 years old at the time, falsely told police he had heard from a schoolmate that petitioner and someone named "Buck" were planning on committing a murder. ("Buck" was codefendant Mark Reilly's nickname.) Boyd denied pressuring his stepson in this way, but the referee found Boyd was not credible on this point.

Petitioner also alleges that, indicative of his guilty state of mind, Boyd testified falsely at both the preliminary hearing and the trial in petitioner's case. For example, at the preliminary hearing, Boyd testified under a false name and testified falsely that he had never been to prison. By the time of trial, Boyd had admitted his status as a felon but falsely testified he had received no consideration for his trial testimony, although he had received immunity for his perjury at the preliminary hearing. The referee ruled specifically on this point, concluding: "At the reference hearing, Boyd admitted that prior to his testimony at trial, [the prosecutor] promised him that he would not be prosecuted for perjury committed at the preliminary hearing. This evidence, as well as the secret grant of immunity which [the prosecutor] awarded Boyd prior to the hearing,[13] showed that Boyd testified falsely when he stated at trial that [the prosecutor] had not promised him anything in connection with his testimony."

---

[13] Apparently surprising both habeas corpus defense counsel and the deputy attorney general, at the evidentiary hearing Boyd announced from the witness stand that he had been granted immunity by the trial prosecutor, Jeffrey Jonas. At the referee's request, Boyd produced the letter, dated a few days before the evidentiary hearing, which stated in part that

At trial, Boyd testified that on the morning after the murders, he entered Steven Rice's apartment around 8:00 a.m. or 9:00 a.m. and used it as a shortcut to exit the apartment complex by jumping over a wall. Once in the apartment, he saw Reilly and petitioner sleeping; Colette Mitchell and Rice were also present. He testified that he used Rice's apartment as a shortcut "mostly every day." This evidence placed petitioner in Reilly's company just hours after the crimes and rendered it more plausible the two of them had acted together in murdering the victims, a point the prosecution emphasized in closing argument. But at the evidentiary hearing, Boyd testified he never used Rice's apartment as a shortcut as there was no need to do so. The referee cited this inconsistency as evidence of Boyd's lack of credibility.

Petitioner makes a number of additional allegations essentially highlighting inconsistencies in Boyd's testimony at trial and argues these discrepancies comprise further evidence of Boyd's duplicity and demonstrate he was the real killer. Two examples suffice: Petitioner first alleges that after the murders Boyd's demeanor changed. He appeared nervous and stopped carrying his knife. This allegation is supported by Rickey Ginsburg's testimony that after the murders Boyd appeared "more nervous and paranoid and . . . real edgy." Harvey's son similarly observed that after the killings Boyd "became paranoid, shaking, everything that he done he done in a rush."

Petitioner also alleges Boyd, at trial, falsely testified he had received no consideration from the Santa Clara County Superior Court in recognition of his assistance in testifying against petitioner. Petitioner alleges Boyd, facing sentencing for a burglary conviction in that county at the time of petitioner's trial, allegedly received the lightest possible sentence in Santa Clara County and, in fact, suffered no penalty at all for having fled the jurisdiction prior to sentencing. Although Boyd touched on the subject at the evidentiary hearing, suggesting that prosecuting authorities in Los Angeles County had made some overtures to obtain leniency for him in Santa Clara County, the referee made no specific findings of fact for these allegations. Accordingly, we assign no weight to them, nor to several other allegations that were not contradicted at the evidentiary hearing, but for which the referee made no finding, such as those involving the precise time Boyd learned of the murders, Boyd's alleged lie about seeing a red stain on petitioner's boots, Boyd's alleged accusation of Reilly, Boyd's alleged conversations with Reilly in the apartment laundry room in which Reilly allegedly made damaging admissions, Reilly's alleged solicitation of Boyd to commit the murders, and others.

---

Boyd was not considered a suspect for the murders of Nancy and Mitchell Morgan "and will not ever be prosecuted for any criminal charge against him relating to the case of People v. Hardy."

### C. *Actual Innocence*

Based on the foregoing allegations, as sustained by the referee and which we have in large part adopted, petitioner contends he is entitled to relief because he is actually innocent of the crimes of which he was convicted and that his "conviction, sentence and confinement are unlawful" because they were achieved in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 1, 7, 13, 14, 15 and 17 of the California Constitution. As we explain, we conclude petitioner is not entitled to relief on the ground of actual innocence.[14]

■ Habeas corpus will lie to vindicate a claim that newly discovered evidence demonstrates a prisoner is actually innocent. A criminal judgment may be collaterally attacked on habeas corpus on the basis of newly discovered evidence if such evidence casts "fundamental doubt on the accuracy and reliability of the proceedings. At the guilt phase, such evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability. (*In re Hall* (1981) 30 Cal.3d 408, 417 [179 Cal.Rptr. 223, 637 P.2d 690]; *In re Weber* (1974) 11 Cal.3d 703, 724 [114 Cal.Rptr. 429, 523 P.2d 229].)" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1246 [275 Cal.Rptr. 729, 800 P.2d 1159].) "[N]ewly discovered evidence does not warrant relief unless it is of such character 'as will completely undermine the entire structure of the case upon which the prosecution was based.' " (*In re Weber*, at p. 724, quoting *In re Lindley* (1947) 29 Cal.2d 709, 723 [177 P.2d 918].) An example of such evidence is a confession of guilt by a third party. (*In re Weber*, at p. 724.)

In this context, " 'newly discovered evidence' is evidence that could not have been discovered with reasonable diligence prior to judgment." (§ 1473.6, subd. (b).) As we explain *post*, in part IV.D.1., the evidence of alleged innocence on which petitioner now relies was reasonably available to him had Demby conducted a reasonably thorough pretrial investigation. It thus seems unlikely this evidence would qualify as "newly discovered."

We need not determine whether evidence of Boyd's involvement qualifies as newly discovered evidence because, even assuming it does, we conclude petitioner's factual allegations, though largely sustained by our referee, fail to demonstrate petitioner is actually innocent. The evidence of Boyd's many lies, his several inculpatory admissions of his involvement in the murders, his multiple attempts—by threats of violence and other coercive behavior—to

---

[14] As will appear *post*, even if petitioner were found to be innocent of the actual killing, he would still be guilty of first degree murder as a coconspirator and an aider and abettor.

prevent witnesses from reporting his inculpatory remarks to police, his false alibi, his threats to Harvey and her son to falsely support his alibi, the cuts on his hands and his ineffectual attempt to explain them away, his habitual possession and brandishing of a knife, all serve to inculpate him in the murders and to throw some doubt on the scope of petitioner's role—said by the prosecutor at trial to be a primary one—in the crimes. Moreover, had the jury heard this evidence, it would have had good reason to doubt Boyd's trial testimony, which was itself extremely damaging to petitioner's case, for Boyd testified to a critical fact, namely, that when he was in the laundry room sometime after the murders, Reilly told him he had committed the murders with petitioner.

None of this evidence, however, is enough for us to conclude petitioner has carried his heavy burden of demonstrating he is actually innocent. " 'Depriving' an accused of facts that 'strongly' raise issues of reasonable doubt is not the standard. Where newly discovered evidence is the basis for a habeas corpus petition, as alleged by defendant, the newly discovered evidence must 'undermine[] the prosecution's entire case. It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury. [Citations.]' (*In re Clark* (1993) 5 Cal.4th 750, 766 [21 Cal.Rptr.2d 509, 855 P.2d 729].)" (*In re Alcox* (2006) 137 Cal.App.4th 657, 670 [40 Cal.Rptr.3d 491].) The evidence adduced at the hearing and endorsed by the referee tends to show Boyd had some hand in the murders, very possibly a primary role; that he lied when he testified he saw petitioner with Reilly in Steven Rice's apartment early in the morning after the crimes; and that he probably lied when he testified that Reilly had told him he (Reilly) and petitioner committed the murders.

But this evidence does not undermine other critical evidence, such as the testimony of Colette Mitchell, who testified petitioner told her he was going to steal something from someone to enable the collection of insurance proceeds; that he had been to the victims' home the night of the murders; that he knew the crime was to be accomplished by cutting the chain on the door; that he received $1,000, apparently for his participation in either the conspiracy or the murders themselves; that Morgan was not worried about the delay the trial caused because his money was earning interest while he was in jail; or that people who said the murder was committed by more than one person were wrong because he " '[knew] for a fact it was one.' " The referee's findings also do not fatally undermine Colette's testimony regarding petitioner's suspicious instructions to her to help dispose of both the stolen M1 carbine rifle and his shoes. That petitioner went to the victims' home *with Reilly and Boyd* is also possible. In short, although the weight and breadth of the evidence showing Boyd participated in the murders is disturbing, such evidence does not fatally undermine the prosecution's entire case against petitioner. The most that can be said is that this evidence would have

presented a more difficult decision for the jury and may well have created in the minds of the jurors a reasonable doubt as to petitioner's guilt. As explained *ante*, this is not the standard. (*In re Weber, supra*, 11 Cal.3d at p. 724, *In re Clark, supra*, 5 Cal.4th at p. 766.)

When we issued an order to show cause on the question of petitioner's actual innocence, our order represented a *"preliminary assessment* that . . . petitioner would be entitled to relief if his factual allegations are proved." (*People v. Duvall, supra*, 9 Cal.4th at p. 475.) After further consideration of the briefs, the record and the referee's report, we conclude our preliminary assessment was wrong, and the allegations, though largely sustained by the referee, fail to undermine the prosecution's entire case against petitioner or point unerringly to his innocence or reduced culpability. Accordingly, we conclude he has not shown he is actually innocent of the crimes.

### D. *Ineffective Assistance of Counsel*

■ Petitioner also alleges he is entitled to relief because his trial attorney, Michael Demby, provided constitutionally ineffective assistance of counsel, in that he failed to investigate, discover and present a significant amount of evidence indicating petitioner may have been innocent and that Calvin Boyd was probably the person who killed Nancy and Mitchell Morgan. The legal standard for determining whether one's attorney was constitutionally ineffective, thereby depriving a defendant of his rights under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution,[15] is settled. " ' "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687–688 [80 L.Ed.2d 674, 104 S.Ct. 2052] . . . ; [*People* v.] *Ledesma* [(1987)] 43 Cal.3d [171,] 215–216 [233 Cal.Rptr. 404, 729 P.2d 839].) Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' (*In re Avena*[, *supra*,] 12 Cal.4th [at p.] 721; accord, *People v. Carter* (2003) 30

---

[15] In the same paragraph, petitioner also alleges his "conviction, death sentence and confinement were obtained in violation of [his] right to . . . due process and a fair trial, to confrontation of witnesses, to a jury trial, to present a defense, to a fair, individualized, reliable and/or nonarbitrary guilt and penalty determination and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 1, 7, 13, 15, 16 of the California Constitution." In light of our decision finding counsel was constitutionally ineffective under the Sixth Amendment, we express no opinion on these additional contentions.

Cal.4th 1166, 1211 [135 Cal.Rptr.2d 553, 70 P.3d 981].)" (*In re Thomas*, *supra*, 37 Cal.4th at p. 1256.) This second part of the *Strickland* test "is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' (*Lockhart* v. *Fretwell* (1993) 506 U.S. 364, 372 [122 L.Ed.2d 180, 113 S.Ct. 838].)" (*In re Harris* (1993) 5 Cal.4th 813, 833 [21 Cal.Rptr.2d 373, 855 P.2d 391].)

### 1. *Demby's Deficient Performance*

Much of the briefing before this court concerns whether Demby's investigation into Boyd's possible involvement was reasonable, what Demby knew about Boyd and when he knew it, and whether the evidence of Boyd's alleged participation in the crimes was reasonably available had Demby investigated. Thus, for example, petitioner alleges his trial counsel was aware, at the time of trial, of the importance to petitioner's defense of investigating Boyd's role in the crimes and therefore knew "further investigation was necessary." (*People v. Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395].) Petitioner also alleges his trial counsel was "on notice" that Boyd's alibi was "potentially false"; that, had Demby "been aware of the evidence of third party culpability which was presented at the reference hearing, he would have presented it at the guilt phase of petitioner's trial"; that several witnesses with relevant evidence regarding Boyd's culpability were available at the time of trial; that "[a]lthough Mr. Demby requested that his investigator interview some of the relevant witnesses, including those whom he called the 'Boyd connection,' most of the interviews were never done and the few that were done were done incompetently"; and that "Mr. Demby's investigation was deficient insofar as he relied on the contents of police reports to decide whether several key witnesses had information helpful to petitioner's defense."

The referee ruled in petitioner's favor on these points. Respondent, in its briefing before this court in both *Hardy I* and *Hardy II*, denied many of these factual allegations and raised many objections to the referee's conclusions. At oral argument, however, when asked whether trial counsel Demby was "ineffective," respondent conceded that he was. We assume respondent meant only that it agreed Demby's investigation of Boyd's involvement in the crimes was deficient (that is, that the investigation fell below an objective standard of reasonableness), for respondent went on to argue Demby's failure to conduct a reasonable investigation was not prejudicial. We accept the concession but find in any event that ample evidence supports petitioner's

allegations (and the referee's conclusions) that Demby knew more investigation of Boyd was justified;[16] that the witnesses with favorable information were reasonably available had Demby investigated the Boyd connection; and that had Demby uncovered this information, he would have presented it to the jury. We specifically find the evidence demonstrates that Demby had reason to interview Raynall Burney, Rickey Ginsburg, James Moss, Sandra Harris Moss, Michael Small, Harvey's son, Steven Rice and Wesley Frank and that their evidence inculpating Boyd was reasonably available at the time of petitioner's trial. The referee so found, and his conclusion is supported by substantial evidence. (*In re Cox, supra,* 30 Cal.4th at p. 998 [referee's findings on the question of the availability of the evidence is a factual determination entitled to great weight if supported by substantial evidence].)

Thus, petitioner's factual allegations, based on evidence presented in the evidentiary hearing in *Hardy I,* as sustained by the referee and adopted herein by this court, demonstrate that numerous witnesses were available at the time of trial and, if contacted, would have testified and recounted (1) Calvin Boyd's numerous statements implicating himself as the one who actually killed the victims; (2) Boyd's personal threats to various people, warning them not to reveal his admissions or his involvement in the murders; (3) several witnesses' observations of Boyd the night of the murders and in the days following that tended to demonstrate his alibi was false and that he participated in the murders (e.g., the suspicious cuts on his hands); and (4) Boyd's efforts to coerce others to corroborate his alibi. Although Boyd denied this evidence, the referee concluded that "both Boyd's own testimony and other evidence presented at the reference hearing showed that at the time of the hearing, Boyd lacked credibility and reliability as a witness." Substantial evidence supports the referee's conclusions regarding the credibility of the witnesses who testified at the evidentiary hearing.

Because Demby failed to ensure the investigation was reasonably thorough, several witnesses with critical information about Boyd's involvement in the murders were not interviewed and their information was not presented at trial. Had Demby been armed with this additional evidence, he would have presented it to bolster petitioner's defense. As the referee concluded, "[i]n his closing arguments at both the guilt and penalty phases, Mr. Demby argued that Calvin Boyd and Marcus, not petitioner, had committed the killings. This suggests that if Mr. Demby had been aware of the evidence, he would probably have presented it." Substantial evidence supports this conclusion, and we adopt it.

---

[16] The referee concluded that "[a]s a general proposition, Mr. Demby acknowledged that at the time he was preparing for trial in petitioner's case, *he realized that investigating Boyd and his relationship to the crime was of great importance to petitioner's defense.*" (Italics added.)

Based on this evidence, the referee concluded: "In sum, this Referee finds that the reason for which Mr. Demby did not present the available evidence pertaining to Calvin Boyd was that Mr. Demby's investigation and that of his office fell below the standard of care, and that therefore Mr. Demby's reasons for not presenting the available evidence [were] not supportable." This conclusion is a mixed question of fact and law subject to independent review. (*In re Ross*, *supra*, 10 Cal.4th at p. 201 [whether counsel's performance was deficient and whether any deficiency prejudiced the petitioner, are both mixed questions subject to independent review]; *In re Lucas* (2004) 33 Cal.4th 682, 694 [16 Cal.Rptr.3d 331, 94 P.3d 477] [same].)

Even had respondent not conceded the point, we would have found, after applying independent review, that the referee's negative assessment of Demby's performance was inescapable. Demby made no opening statement at the guilt phase of the trial and called no witnesses of his own, contenting himself to cross-examine the witnesses called to the stand by other parties, i.e., the prosecutor and petitioner's codefendants Reilly and Morgan. While that strategy, standing alone, is not per se unreasonable, Demby's closing guilt phase argument made clear that his strategy was to create a reasonable doubt in the minds of the jurors by convincing them it was Boyd—not petitioner—who, along with Reilly and possibly Marcus, went to the victims' home that deadly night in May 1981, and that Boyd was the actual killer. That Demby had planned on making this line of argument his primary means of attacking the prosecution's case is apparent from his pretrial instructions to his investigators to investigate the Boyd connection and to interview witnesses at the Vose Street apartments in an attempt to uncover evidence of Boyd's culpability. That this was Demby's strategy is also apparent from the absence of any other defense (other than to emphasize discrepancies in the prosecution witnesses' testimony) and by Demby's own testimony at the evidentiary hearing that more potent evidence of Boyd's culpability would have been consistent with his "defense theme."

We thus turn to whether defense counsel's failure to investigate was prejudicial to petitioner.

### 2. *Prejudice at the Guilt Phase*

Demby's unreasonable failure to conduct a more thorough and reasonably comprehensive pretrial investigation into the Boyd connection, and his subsequent failure to present reasonably available evidence of Boyd's guilt at petitioner's trial, would not require relief on the ground of ineffective assistance unless his deficient performance was prejudicial. (*Wiggins v. Smith* (2003) 539 U.S. 510, 534 [156 L.Ed.2d 471, 123 S.Ct. 2527].) In this context, we assess prejudice by evaluating three factors: What evidence was available

that counsel failed reasonably to discover? How strong was that evidence? How strong was the evidence of guilt produced at trial? (See *In re Thomas, supra,* 37 Cal.4th at p. 1265.) We have already described in detail the evidence from various witnesses that implicated Boyd in the murders. To recap here: Boyd was a felon who was a fugitive from the law. In the days following the murders, he made comments to several people suggesting he was the actual killer, including that he tripped on a child, then put a pillow over his face and stabbed him. (There was evidence the victims were stabbed through a pillow.) Boyd was heard to exclaim that he wanted his share of the money for the killing and that petitioner changed the plan by failing to appear and would now get away free because "he did not do anything." Boyd threatened several people with violence, warning them not to give his name to the police, and he habitually carried a knife similar to the murder weapon. More than one witness reported that shortly after the murders, Boyd had cuts on his hands and tried to conceal their origin, telling a false story about working on a friend's car. Boyd concocted a false alibi and coerced his wife and young stepson to support it, indicating a consciousness of guilt. Boyd falsely claimed he had traversed Steven Rice's apartment early in the morning after the murders and saw petitioner and Reilly together. Perhaps most incriminating, although Boyd claimed to have passed out in his apartment the night of the murders, one witness saw him walking around the apartment complex between 10:00 p.m. and 11:00 p.m., and another witness saw him leave the apartment complex with his friend Marcus around 11:00 p.m. The referee found the witnesses who provided the foregoing evidence were credible and that Boyd, in denying the evidence, was not. This evidence, reasonably available to counsel, was strong and persuasive, coming from several different witnesses who had interlocking recollections of the night before and the days after the murders.

The evidence from the witnesses petitioner now presents, missing at trial but reasonably available to counsel, would have pointed the finger of guilt at Boyd, undermined his alibi and severely damaged his credibility, which in turn would have impeached two critical pieces of evidence on which the prosecution relied to convict petitioner: Reilly's alleged confession to Boyd in the laundry room that petitioner was one of the killers, and Boyd's claim that he saw petitioner and Reilly together just a few hours after the murders. Indeed, the referee found this latter assertion was untrue.

By contrast, the prosecution argued at trial that petitioner and Reilly committed the murders, that petitioner was the actual killer, and that Reilly either held the victims down or waited outside while petitioner alone stabbed them to death. Subtracting Boyd's testimony, the evidence that petitioner was the actual killer was weak and circumstantial. Reilly did not testify. Although codefendant Morgan testified, he knew of no evidence linking petitioner to the murders. (*People v. Hardy, supra,* 2 Cal.4th at p. 126.) No

eyewitness to the crimes testified, and no witness placed petitioner at the scene of the crime at the time of the murders. No witness reported seeing petitioner leave the apartment complex the night of the crimes.

Although the murders spilled much of the victims' blood, no blood evidence linked petitioner to the crime scene. By contrast, police found a spot of human blood on one of Reilly's shoes. (*People v. Hardy, supra*, 2 Cal.4th at pp. 121–122.) (Michael Mitchell, Reilly's roommate, reported hearing two male voices and the shower running in the middle of the night. While this might explain the police's failure to find any blood evidence on petitioner's clothes, it may equally well have been Reilly and Boyd who took the showers.)

No fingerprint, footprint, hair or other forensic evidence connected petitioner to the crimes. The murder weapon was never found. Petitioner was not known to carry a knife, and no evidence was presented that he had ever used a knife in any sort of criminal endeavor.

Although Harvey's son told police he had heard both at school and from Steven Rice that petitioner was one of the killers, he disavowed those statements at the evidentiary hearing, explaining that Boyd had pressured him to say them. Because Boyd, whom he feared, was in custody at the time of trial, Harvey's son would have testified and revealed the falsity of his accusations.

Aside from Boyd's now discredited evidence, the main evidence implicating petitioner in the murders came from Colette Mitchell, petitioner's then girlfriend. She testified she had passed out that fateful night and thus did not know if petitioner had left the apartment and later returned. Her inability, however, to account for petitioner's whereabouts during the hours of the murders—between sometime after 2:00 a.m., when she passed out, and 11:00 a.m., when she woke up and found petitioner sleeping in the apartment—is not the same as saying she saw petitioner leave the apartment during the night. As far as Colette knew, petitioner was with her in the apartment the entire night. The only evidence petitioner left the apartment that night came in the form of a statement Colette testified Reilly allegedly made to her.

Colette testified and recounted some of petitioner's and Reilly's comments to her, revealing that petitioner made inconsistent statements about the crimes. Although his comments implicated him in the conspiracy, he never admitted to Colette that he was the actual murderer. For example, Colette testified that after the murders, she and petitioner discussed his alibi "all the time," but this may have been because he participated in the conspiracy, not the actual murders. Colette also testified that prior to the crimes, petitioner

led her to believe he was going to steal something from someone to enable an unnamed person to collect on some insurance policy. But an anticipated theft is far different than the double murder that was planned by Morgan and Reilly and eventually committed by Reilly and his confederates.

Regarding the actual murders, Colette testified petitioner told her at least twice that he had been to the victims' home the night of the murders, but he also made comments suggesting he was not the actual killer. Although Reilly admitted to knowing the identity of the killers, petitioner denied such knowledge and further denied he was the killer. When she asked petitioner directly whether he was the killer, he also answered in the negative. Despite his suspicious comments suggesting he knew many details surrounding the crimes, Colette conceded petitioner never actually admitted having killed or stabbed anyone. In short, Colette's account of petitioner's alleged statements was contradictory and equivocal.

Colette also reported that Reilly told her Boyd and Marcus were supposed to commit the crimes but had backed out because Reilly declined to go with them, thereby suggesting it was petitioner who substituted in. This evidence could have been met with the testimony of James Moss, who could have testified that he heard Boyd angrily state that it was *petitioner* who had not shown up and that Boyd had to go in his place.

Petitioner made many statements to Colette that suggested he participated in the conspiracy to kill the victims and collect the insurance, but in none of them did he admit that he actually stabbed the victims. For example, Colette testified petitioner told her that Morgan was not worried about the trial delay because his insurance proceeds were earning interest. This statement merely shows petitioner had knowledge of the crimes and may have been a conspirator. Similarly, his statement that Reilly was in charge, that he knew "for a fact" there was only one killer, and that boltcutters were used to enter the house clearly implicate him in the conspiracy but do not strongly support the prosecution's theory that it was petitioner, and not some other actor such as Reilly or Boyd, who personally stabbed the victims. Although Colette testified petitioner received $1,000, apparently for his role in the crimes, she admitted on cross-examination that she did not know where the money came from, could not remember who informed her of the money's origin, and could not remember the first time she saw the money but remembered seeing it in her cedar box. She could not even remember whether it was she herself who put the money in the box. Moreover, this evidence also was equivocal: Was it payment for petitioner's part in the conspiracy or because he actually killed the victims?

Colette also testified that petitioner asked her to help dispose of a pair of shoes and the stolen M1 carbine rifle, but this evidence similarly was

equivocal. Presumably petitioner sought the disposal of both items because they potentially incriminated him in the conspiracy (though in fact no footprints were found), but neither the shoes nor the rifle strongly demonstrate petitioner was the actual killer.

In short, although Colette testified and recounted several statements petitioner had made that implicated him in the conspiracy to kill the victims for financial gain, petitioner's comments do not strongly support the prosecutor's theory that he was the actual killer. The persuasive power of Colette's testimony was further undermined by the fact she was subject to impeachment due to her drug and alcohol use and that she admitted lying for petitioner at his preliminary hearing.

In a habeas corpus petition alleging trial counsel's investigation or presentation of evidence was incompetent, "the petitioner must show us what the trial would have been like, had he been competently represented, so we can compare that with the trial that actually occurred and determine whether it is reasonably probable that the result would have been different." (*In re Fields* (1990) 51 Cal.3d 1063, 1071 [275 Cal.Rptr. 384, 800 P.2d 862].) After weighing the available evidence, its strength and the strength of the evidence the prosecution presented at trial (*In re Thomas, supra,* 37 Cal.4th at p. 1265), can we conclude petitioner has shown prejudice? That is, has he shown a probability of prejudice "sufficient to undermine confidence in the outcome"? (*Strickland v. Washington, supra,* 466 U.S. at p. 694 (*Strickland*); *In re Thomas,* at p. 1256.)

Were we considering a situation in which petitioner was convicted solely on the theory that he was the actual killer—the person who personally stabbed Nancy and Mitchell Morgan to death—we would conclude the amount and quality of reasonably available evidence showing Boyd was the killer, coupled with the general dearth of evidence indicating petitioner personally killed the victims, undermined confidence in the verdicts to such an extent as to require that we vacate the murder convictions.

But although the prosecutor proceeded primarily on the theory that petitioner was the actual killer, he also presented to the jury two theories of derivative liability: conspiracy, and aiding and abetting. As we explain, both theories support the jury's verdict of first degree murder.

a. *Conspiracy*

One who conspires with others to commit a felony is guilty as a principal. (§ 31.) " 'Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the

reasonable and probable consequences of the common unlawful design.' (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 93, pp. 310–311; see also *People v. Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861].)" (*People v. Flores* (2005) 129 Cal.App.4th 174, 182 [28 Cal.Rptr.3d 232].) Thus, if petitioner conspired with others to kill the victims for financial gain, he is as guilty of their murders as the person who actually stabbed them. (*People v. Hardy, supra,* 2 Cal.4th at pp. 188–189.)

The amended information demonstrates that the prosecutor intended to rely on a conspiracy theory. That document charged petitioner with conspiracy "to commit the crime of [m]urder for the purpose of collecting life insurance proceeds upon the life of Nancy Carol Morgan and Mitchell Raymond Morgan." Although many of the alleged overt acts involve Reilly and Morgan only, the list of 24 overt acts also specifies that "Reilly and defendant Hardy met on May 20th at the Vose Street apartments in Van Nuys with Colette Mitchell to formulate their alibi." In addition, "[s]ometime between 12:30 AM and 7:30 AM on the 21st of May, defendants Reilly and Hardy left the Vos[e] Street apartments to commit the murders at [Morgan's home]." In addition, "Reilly, Hardy and Morgan, while in custody and during the preliminary hearing, attempted to fabricate an alibi," including passing notes to each other in jail. Further, the information alleged that "Reilly and defendant Hardy had over 60 contacts [with coconspirators] while awaiting and during the preliminary hearing," and that petitioner asked his brother to dispose of an M1 carbine rifle. The jury was given a copy of the amended information listing the alleged overt acts.

With regard to conspiracy liability, the jury was instructed: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include:

"1. Those who directly and actively commit or attempt to commit the act constituting the crime, or

"2. . . .

"3. *Those who, whether present or not at the commission or attempted commission of the crime, advise and encourage in its commission or attempted commission.*" (Italics added.)

Further instructions also make clear the prosecutor was relying on a conspiracy theory of liability. With regard specifically to coconspirator liability for murder, the jury was instructed that if it had a reasonable doubt any of the charged defendants were present at the scene of the crime when the

murders were committed, it should acquit him, with this caveat: "However, if the evidence establishes beyond a reasonable doubt that a defendant aided and abetted the commission of *or was a coconspirator in the commission of the offenses charged in this case*, the fact, if it is a fact, that he was not present at the time and place of the commission of the alleged offenses for which he is being tried is immaterial and does not, in and of itself, entitle him to an acquittal.

"A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit a public offense and with the further specific intent to commit such offense, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement.

"In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the overt acts alleged in the information. It is not necessary to the guilt of any particular defendant that he himself committed the overt act, if he was one of the conspirators when such an act was committed." (Italics added.)

After defining the meaning of the phrase "overt act," the instructions continued: "The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for an act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act." No doubt because Morgan and Reilly were the ones who originally hatched the plot to kill the victims for the insurance money, with petitioner joining the conspiracy later, the jury was also instructed: "Every person who joins a criminal conspiracy after its formation and who adopts its purposes and objects, is liable for and bound by the acts and declarations of other members of the conspiracy done and made during the time that he is a member and in pursuance and furtherance of the conspiracy. [¶] . . . [¶] Evidence of any acts or declarations of other conspirators prior to the time such person becomes a member of the conspiracy may be considered by you in determining the nature, objectives and purposes of the conspiracy, but for no other purpose."

The prosecutor raised the conspiracy theory of first degree murder in closing argument, stating that "based upon the facts of this case, . . . if one conspires to commit a murder for the purposes of collecting insurance, what is it other than premeditation and deliberation [justifying a verdict of first degree murder]?" More pointedly, the prosecutor later argued: "We submit to

you that Mr. Hardy joined that conspiracy, and when he joins the conspiracy, he adopts those acts [committed by Reilly and Morgan]."

The prosecution presented substantial evidence supporting its theory that petitioner participated in a conspiracy to kill Nancy and Mitchell Morgan for financial gain. For example, it presented evidence that Morgan was the mastermind of the plot and stood financially to gain from some suspiciously lucrative life insurance policies; that he recruited Mark Reilly to play the principal role in carrying out the murder by offering to share the money and set him up as the manager in a bar; and that Reilly tried to convince several people to commit the murders, going so far as to pay someone (Marc Costello) in an aborted attempt to have the victims killed. Strong evidence linked Reilly to the actual killings. As we explained in our opinion on appeal: "When Debbie [Sportsman] read about the murders in the newspaper the next day, she became hysterical and went to Reilly's apartment. She found him there with Hardy; Reilly was calm and both were laughing and drinking. Reilly told her to behave normally so people would not suspect something was amiss. Without revealing the identity of his crime partner, Reilly admitted to her that he had gone with another person to Morgan's home, unlocked the front door, cut the security chain lock with [boltcutters], and entered the house, his partner apparently entering the bedroom. Reilly said that when he heard Nancy Morgan pleading for her life, he went to wait outside. His partner, the actual killer, eventually emerged and told him Nancy 'just wouldn't die.' Reilly told Debbie that 'you just don't know how it feels' to stab someone. He encouraged Debbie to speak to Hardy and another friend, Colette Mitchell, in order to coordinate their alibi stories. He then gave her a few $100 bills that he had received from Morgan." (*People v. Hardy*, *supra*, 2 Cal.4th at pp. 120–121.) In addition, Reilly could not explain how human blood came to be on his shoe.

Although the evidence that petitioner committed the murders was much weaker, especially in light of the evidence at the reference hearing that Boyd was the actual killer, he was strongly linked to the conspiracy. "According to Debbie Sportsman, Reilly began associating with Hardy around May 10, 1981. She testified that the two men had many private conversations during this period and often drank and took drugs together. On the evening of May 20, 1981, the night of the killings, Debbie met with Hardy and Reilly at the latter's apartment. Reilly spoke with Morgan on the telephone and asked him if he wanted to go through with the killing. Morgan, who was in Carson City, answered that he did." (*People v. Hardy*, *supra*, 2 Cal.4th at p. 120.) Petitioner thereafter discussed his alibi with Colette Mitchell "all the time," and he coordinated his alibi with Reilly as well. According to Colette, petitioner knew several details about the crimes, including that the assailants had used a tool to cut the chain lock, that life insurance proceeds were the reason for the killing, that the money was collecting interest, and that Reilly

was in charge. Most incriminating was petitioner's receipt of $1,000 in $100 bills after the murders, his instruction to Colette to dispose of his shoes on learning that police might have discovered some footprints at the crime scene, and his direction to dispose of the M1 carbine rifle allegedly stolen from the Morgan home. Even discounting petitioner's inconsistent statements to Colette about whether he had participated in the actual killing, there is ample evidence showing he participated in the plan to kill the victims as part of a wider conspiracy to defraud the insurance companies.

The jury relied, at least in part, on a conspiracy theory to convict petitioner, for it separately convicted him of conspiracy to commit murder for purposes of insurance fraud in violation of section 182. We thus conclude substantial evidence supports the theory that petitioner was guilty of first degree murder on a conspiracy theory.

### b. *Aiding and Abetting*

The prosecutor also relied on an aiding and abetting theory of liability for first degree murder, which provides an alternative reason for concluding petitioner was not prejudiced at the guilt phase by Demby's deficient investigation. Thus, with regards to aiding and abetting liability, the jury was instructed: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include:

"1. Those who directly and actively commit or attempt to commit the act constituting the crime, or

"2. Those who, with knowledge of the unlawful purpose of the person who directly and actively commits or attempts to commit the crime, aid and abet in its commission or attempted commission . . . ."

In addition, the jury was instructed: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.

"A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator or the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. Mere presence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting."

The prosecutor argued this theory of liability to the jury, informing it that "[i]f you find that this is a first degree murder and if you find that each one of

these individuals participated in that, either by aiding, abetting, by personally becoming involved, by encouraging, by soliciting, by aiding and abetting, each one of them individually [is guilty of first degree murder]." And later, the prosecutor argued that although petitioner was not charged personally with solicitation to commit murder because he was the one solicited by Reilly, petitioner nevertheless "could be an aider and abettor."

For much the same reasons we found substantial evidence supported a conspiracy theory of liability for first degree murder, we also find substantial evidence supports an aiding and abetting theory of liability. To recap: Overwhelming evidence tied Reilly to the conspiracy and the murders, he told people he solicited petitioner to participate, petitioner was often in Reilly's company in the days before and after the murders, petitioner was in the apartment when Reilly received the final approval from Morgan to proceed with the murders, petitioner discussed his alibi frequently in the days following the murders, he knew many details about the crimes, and he instructed Colette Mitchell to help dispose of a potentially incriminating M1 carbine rifle and a pair of shoes.

We thus conclude substantial evidence supports the theory that petitioner was guilty of first degree murder as an aider and abettor.

### c. *Conclusion*

▉ After weighing this evidence and considering what petitioner's trial would have looked like had he been represented by competent counsel (*In re Fields, supra,* 51 Cal.3d at p. 1071), we conclude that although there is a reasonable probability the jury would not have convicted petitioner on the prosecution's proffered theory that he was the actual killer, ample evidence remains that petitioner was guilty of the murders on the alternative theories that he conspired with, and aided and abetted, Reilly, Morgan and others to commit the murders. As, according to their joint plan, Reilly, Boyd or possibly some third party killed the victims in furtherance of their conspiracy to fraudulently obtain insurance proceeds, petitioner, as a coconspirator and aider and abettor, is as guilty of the murders as if he stabbed the victims himself. Because petitioner would have been convicted of two first degree murders on these two theories of derivative liability irrespective of Demby's unreasonable failure to investigate and present evidence of the Boyd connection, petitioner fails to demonstrate he would have achieved a more favorable outcome at the guilt phase had Demby competently investigated the Boyd connection. Accordingly, we conclude petitioner fails to demonstrate prejudice at the guilt phase flowing from Demby's deficient representation. (*Strickland, supra,* 466 U.S. at pp. 687–688.)

### 3. *Prejudice at the Penalty Phase*

Our conclusion that petitioner was not prejudiced at the guilt phase by trial counsel's failure to investigate and present available evidence of Boyd's involvement in the murders does not end our inquiry; we must still determine whether Demby's failings prejudiced petitioner at the penalty phase. As we are now concerned exclusively with the penalty phase, we must address a threshold question raised by respondent: Would evidence suggesting Boyd was guilty of murdering Nancy and Mitchell Morgan have been admissible at the penalty phase of petitioner's trial?

### a. *Admissibility of Boyd's Guilt at the Penalty Phase*

We have previously explained why evidence of Boyd's possible guilt of the murders did not fall outside the scope of our reference order in *Hardy I.* (See, *ante*, at pt. IV.A.2.) In a related argument, respondent contends such evidence should not have been admitted at the hearing (or considered by the referee) because evidence of Boyd's possible guilt of the murders (not having been admitted at the guilt phase) would have been inadmissible at the penalty phase of petitioner's trial, and Demby's failure to offer it therefore could not have been deficient performance. Respondent raised this objection at the reference hearing, thus preserving it for our review. Respondent also now takes exception to many of the referee's factual findings on this ground.

We overrule respondent's exception because the referee correctly concluded petitioner's evidence of Boyd's culpability would have been admissible at the penalty phase. Evidence that Boyd was the actual killer—and that petitioner was not present during the commission of the murders—would have been admissible under factors (a), (j) and (k) of section 190.3 to show the circumstances of the crimes and allow the jury to consider whether petitioner's participation in the offenses, which rendered him legally culpable for the murders, also justified imposition of the harshest penalty. Because we find the evidence was admissible on these grounds, we express no opinion on respondent's assertion that the evidence was inadmissible under *In re Gay* (1998) 19 Cal.4th 771, 814 [80 Cal.Rptr.2d 765, 968 P.2d 476].[17]

---

[17] The United States Supreme Court's recent decision in *Oregon v. Guzek* (2006) 546 U.S. 517 [163 L.Ed.2d 1112, 126 S.Ct. 1226] does not alter our conclusion. In *Guzek*, a capital defendant sought to introduce new evidence showing he was not present at the time of the murder. The Oregon Supreme Court held the Eighth Amendment to the United States Constitution did not create a constitutional right enabling the defendant to introduce this evidence at his sentencing proceeding. The high court affirmed, explaining: "the federal question before us is a narrow one. Do the Eighth and Fourteenth Amendments grant Guzek a constitutional right to present evidence of the kind he seeks to introduce, namely *new* evidence that shows he was not present at the scene of the crime. That evidence is *inconsistent* with Guzek's prior conviction. It sheds no light on *the manner* in which he committed the crime for

Having rejected respondent's argument that the referee erred in admitting evidence of Boyd's possible guilt of the murders at the hearing, we turn, finally, to the question whether Demby's deficient performance regarding the investigation and presentation of evidence of the Boyd connection prejudiced petitioner at the penalty phase.

### b. *Prejudice Analysis*

■ We have determined Demby acted unreasonably in failing to investigate, discover and present evidence of Boyd's possible culpability in the murders. We have also determined that this evidence was reasonably available to Demby and that it would have been admissible at the penalty phase of petitioner's trial. The final piece to the puzzle is one of prejudice. In order for petitioner to obtain relief on the theory of ineffective assistance of trial counsel at the penalty phase, he must establish that he suffered prejudice as a result of Demby's failures. "Prejudice is established when ' "there is a reasonable probability that, absent the errors [of counsel], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." [Citations.] As in the guilt phase, reasonable probability is defined as one that undermines confidence in the verdict.' ([*In re*] *Marquez, supra*, 1 Cal.4th at p. 606.)" (*In re Gay, supra*, 19 Cal.4th at p. 790.)[18] "In assessing prejudice [at the penalty phase], we reweigh the evidence in aggravation against the totality of available mitigating evidence." (*Wiggins v. Smith, supra*, 539 U.S. at p. 534.) As we explain, after engaging in reweighing the evidence, we conclude there is a reasonable probability the jury, had it heard the evidence indicating Boyd and not petitioner was most likely the person who actually killed the victims, would have voted for a life sentence instead of the penalty of death.

---

which he has been convicted. . . . We can find nothing in the Eighth or Fourteenth Amendments that provides a capital defendant a right to introduce new evidence of this kind at sentencing." (*Guzek*, at p. 523.) "[S]entencing traditionally concerns *how*, not *whether*, a defendant committed the crime. [Citation.] But the evidence at issue here—alibi evidence—concerns only *whether*, not *how*, he did so." (*Id.* at p. 526.)

Even assuming without deciding that *Guzek* applies retroactively to this case, the evidence of lingering doubt petitioner argues Demby should have presented is distinguishable from the evidence sought to be admitted in *Guzek*. Unlike in *Guzek*, petitioner's evidence that Boyd was the actual murderer and petitioner merely a coconspirator, is relevant to *how*, and not *whether*, petitioner is guilty. Evidence of the Boyd connection also "sheds . . . light on *the manner* in which he committed the crime for which he has been convicted." (*Oregon v. Guzek, supra*, 546 U.S. at p. 523.)

[18] "Alternatively, the petitioner may establish that as a result of counsel's inadequacy, the prosecution case was not subject to meaningful adversarial testing, thereby raising a presumption that the result is unreliable. (*United States v. Cronic* (1984) 466 U.S. 648, 658–659 [80 L.Ed.2d 657, 104 S.Ct. 2039].)" (*In re Gay, supra*, 19 Cal.4th at p. 790.) No issue of error under *Cronic* is presented.

The aggravating evidence against petitioner consisted of the circumstances of the offense, as presented in the guilt phase, and as augmented by three photographs of the victims that were not admitted at the guilt phase. In addition, the prosecution presented evidence of a prior incident involving petitioner that required law enforcement intervention: "On August 6, 1980, Officers Hansen and Wicks responded to a report of a domestic disturbance. They found Hardy assuming a military marching pose holding a rifle. He appeared unaware of his surroundings. Although he complied with Hansen's request to put the rifle down, Hardy refused to move away from it. At Hansen's request, Hardy also removed two knives from his waistband and placed them next to the rifle. Hardy then produced a nunchaku and assumed a fighting stance. Although Officer Hansen directed Hardy to place the nunchaku on the ground, Hardy remained in a fighting stance for five or ten minutes. He eventually agreed to put down his nunchaku if Officer Wicks put down his service revolver. When Wicks complied, Hardy surrendered peacefully and explained he had just been in a family quarrel. The rifle was not loaded. Hardy later pleaded guilty to misdemeanor possession of nunchakus and disturbing the peace; he was placed on probation." (*People v. Hardy*, *supra*, 2 Cal.4th at pp. 126–127, fn. omitted.)

Petitioner's mother testified to another incident, explaining she once called the police after petitioner "punched his brother John and pulled a gold chain off John's neck." (*People v. Hardy*, *supra*, 2 Cal.4th at p. 127.) When petitioner realized his mother had called the police, "he kicked down her door." (*Ibid.*) His mother told police she was concerned petitioner had taken some PCP.

Petitioner's showing in mitigation was meager. Carolyn Hardy, petitioner's mother, testified that "the nunchaku [petitioner] brandished belonged to his other brother, Robert. She explained that Robert had told his family he intended to commit suicide but [petitioner] did not believe him. When Robert carried out his threat, [petitioner] blamed himself for Robert's death. The day after Robert's death, [petitioner] threw himself off a mountain, broke both his legs, and was bedridden for six months. Carolyn Hardy believed [petitioner] needed psychiatric help." (*People v. Hardy*, *supra*, 2 Cal.4th at p. 127.) In addition, "Carolyn Hardy testified [petitioner] had participated in a program called Outward Bound, which involved camping and hiking in Colorado. He was chosen for the program because of his high scholastic potential. [Petitioner] presented no other affirmative mitigating evidence at the penalty phase." (*Ibid.*)

The prosecution's theory of the case was that petitioner was the actual perpetrator of the murders. The prosecutor argued Reilly did not stab the victims himself, that he went to the Morgans' home, but "became horrified"

and left, waiting outside while the victims were killed by a confederate. By contrast, the prosecutor argued that petitioner personally stabbed both Nancy and Mitchell Morgan and then walked out of the house and calmly described the scene to Reilly.

Demby's strategy at the penalty phase was to attempt to convince the jury that a lingering doubt existed as to petitioner's guilt. Indeed, the referee found "Demby's sole penalty phase defense was lingering doubt." Thus, Demby argued: "I have to respect [the jury's guilt judgment] even though personally I don't agree with it. I have doubts. [¶] The things that are bothering me, I am not certain if [petitioner] participated, if he did partici-pate, what his participation was." Demby noted that when Reilly was arrested, Sportsman asked him about the night in question, whether Reilly had left the apartment and whether petitioner had taken part in the murder. As Demby recounted it, Reilly told Sportsman: "Well, [petitioner] didn't know I left. He was too loaded."

Demby continued: "I guess that bothers me because I can't, because of that statement and others, I can't be certain that [petitioner] is the killer. [¶] I keep going back to the testimony and demeanor of Calvin Boyd because I honestly believe Calvin Boyd participated and that thought causes problems because what you are being asked to do is decide the fate of [petitioner], should he live or should he die. Die in the gas chamber or should he spend the rest of his life in prison." "I am not talking about [being] certain beyond a reasonable doubt, but absolutely certain what [petitioner's] participation was."

The jury was instructed and then retired to deliberate at 11:25 a.m. on September 22, 1983, being excused at 3:45 p.m. later that day. Deliberations continued all day on September 23, 1983, and resumed at 9:10 a.m. on Monday, September 26, 1983. The jury announced it had reached a verdict at 10:12 a.m. that same day. It thus appears the jury deliberated less than two days to decide both Reilly and petitioner deserved the death penalty.

Petitioner has discovered considerable mitigating evidence that was not presented at his penalty phase, and this evidence forms the basis of his petition in *Hardy I*. But without considering this mitigating evidence, we conclude that had the jury been aware that petitioner was likely not the actual killer, but merely participated in the conspiracy to kill for insurance proceeds, there is a reasonable probability the jury would have viewed the balance of aggravating and mitigating circumstances differently and con-cluded petitioner did not deserve the death penalty. (*In re Gay, supra*, 19 Cal.4th at p. 790.) He was young and had but a minor criminal record. He had experienced substantial emotional problems after his brother committed

suicide and may have blamed himself for failing to take his brother's warnings seriously. He descended into despair and drug abuse, and conspired with Reilly, Morgan and others to kill the victims for money. This much the jury knew.

But the jury operated under the understanding, fostered by the prosecutor's closing argument, that petitioner personally stabbed the victims. If that were true, petitioner's moral responsibility for the crimes would be at the zenith, with no coconspirator having greater culpability. That he killed more than one victim, that he killed a child, that he did so in such a brutal and horrific manner, that he did so simply for money and according to a preconceived plan, all these factors substantially aggravated the case and amply justified the jury's verdict that he should suffer the death penalty for his crimes. But if he did not kill anyone, if he merely conspired with Reilly and Morgan and Boyd, if he did not show up at the appointed hour, if he was lying passed out from drink and drugs that fateful night instead of stabbing a defenseless woman and child in the dark of night, the nature of his moral culpability is quite different. More to the point, the jury's weighing of the relative aggravating and mitigating factors would have been entirely different. Under the circumstances, Demby's unreasonable failure to discover and present evidence of Boyd's involvement so undermines our confidence in the penalty verdict (*In re Gay, supra,* 19 Cal.4th at p. 790; *In re Marquez, supra,* 1 Cal.4th at p. 606) that we conclude, after weighing the totality of the evidence (*Wiggins v. Smith, supra,* 539 U.S. at p. 534), that we must vacate the penalty judgment.[19]

---

[19] Because we conclude there was substantial evidence to support aiding and abetting as an alternative theory of petitioner's liability for the murders, we also reject petitioner's argument, raised at oral argument, that the special circumstance allegations cannot attach to a murder that a person did not personally commit. At the time of the crimes (1981), section 190.2, subdivision (b) provided: "Every person *whether or not the actual killer* found guilty of intentionally *aiding, abetting,* counseling, commanding, inducing, soliciting, requesting, or *assisting any actor in the commission of murder in the first degree* shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated [in certain] paragraph[s] . . . of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true." (§ 190.2, former subd. (b), as added by initiative, Prop. 7, § 6, as approved by voters, Gen. Elec. (Nov. 7, 1978), italics added.) Petitioner's jury was instructed with the then current version of CALJIC No. 8.84 (1981 rev.) (4th ed. 1979), which tracked the language of this statute.

Accordingly, even if petitioner was not the actual killer and is guilty of first degree murder only as an aider and abettor, he may still, on remand, be sentenced to life without the possibility of parole or death following a new penalty phase trial. The same conclusion follows were he guilty of first degree murder on a conspiracy theory. (*People v. Hernandez* (2003) 30 Cal.4th 835, 866 [134 Cal.Rptr.2d 602, 69 P.3d 446].)

## V. CONCLUSION

In light of the above discussion, the petition for a writ of habeas corpus in *Hardy II*, S093694, is granted in part and denied in part, as explained below:

(1) Petitioner fails to demonstrate he is actually innocent of the crimes of which he was convicted. To the extent the petition for a writ of habeas corpus in *Hardy II* is based on that allegation, it is denied. To the extent the order to show cause in *Hardy II* was based on a claim of actual innocence, it is discharged.

(2) Although petitioner has proven, and respondent concedes the truth of, his allegations that his trial counsel unreasonably failed to investigate, discover and present available evidence of Calvin Boyd's culpability for the murders of Nancy and Mitchell Morgan, this failure does not require vacation of his two convictions for first degree murder with special circumstances because this new evidence does not undermine our confidence that the jury would nevertheless have convicted him of murder by relying on a conspiracy theory, there being ample evidence petitioner was a coconspirator in the scheme to kill the victims in order to share in the anticipated insurance payout. To the extent the petition for a writ of habeas corpus in *Hardy II* is based on that allegation, it is denied. To the extent the order to show cause in *Hardy II* was based on a claim that counsel's ineffectiveness requires we vacate the guilt judgment, it is discharged.

(3) Because the jury returned a verdict of death after a penalty trial in which the prosecution argued that petitioner was the actual killer, and because substantial doubt now exists that this was so, this new evidence casting doubt that petitioner was the killer so undermines our confidence in the penalty verdict (*In re Gay, supra*, 19 Cal.4th at p. 790; *In re Marquez, supra*, 1 Cal.4th at p. 606) that we conclude, after reweighing the totality of the evidence (*Wiggins v. Smith, supra*, 539 U.S. at p. 534), that a different, more favorable result was reasonably probable had this evidence been presented to the jury. Accordingly, we grant the petition in *Hardy II* to that extent and vacate the judgment insofar as the penalty of death was imposed.

(4) The balance of the petition in *Hardy II*, which raises a number of other issues, is denied as having failed to raise a prima facie case for relief.

(5) Having granted petitioner relief from the penalty judgment in *Hardy II*, we need not resolve his various other challenges to the penalty judgment in *Hardy I*, S022153. Accordingly, the order to show cause is discharged, and the petition for a writ of habeas corpus in *Hardy I*, to the extent it was based on the claim that trial counsel was ineffective for failing to investigate and

present reasonably available mitigating evidence, is dismissed as moot. We express no opinion as to whether trial counsel was ineffective on that ground.

(6) The balance of the petition in *Hardy I*, which raises a number of other issues, is denied as having failed to raise a prima facie case for relief.

Petitioner is remanded to the custody of the Sheriff of the County of Los Angeles (see § 1493) to be held pending retrial of the penalty phase. Respondent shall cause notice of the writ to be served on the District Attorney of the County of Los Angeles upon the finality of this opinion. (See § 1382, subd. (a)(2).) Should petitioner not be granted a new penalty trial within the time specified in section 1382 or any continuances granted by the superior court, the court shall impose the penalty of life imprisonment without the possibility of parole.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.